**SILAS MASON CO., Inc., et al. v. UNITED STATES.**

No. 44659.

Court of Claims.

Oct. 1, 1945.

This case having been heard by the Court of Claims, the court, upon the evidence and the report of a commissioner, makes the following special findings of fact:

1. Plaintiffs are, and during the time in controversy were, Silas Mason Company, Inc., a corporation organized and existing under the laws of the State of Delaware, of the City of New York, N. Y.; Walsh Construction Company, a corporation organized under the laws of the State of Iowa, of the City of Davenport, Iowa; and Atkinson-Kier Company, a partnership consisting of Guy F. Atkinson, George H. Atkinson, William E. Kier, and Elmer L. Kier, of the City of San Francisco, Cal.

2. On July 16, 1934, plaintiffs entered into a contract with the United States, represented by R. F. Walter, Chief Engineer, Bureau of Reclamation, as contracting officer, to furnish labor and materials, and perform all work required for construction of Grand Coulee Dam and Power Plant (first development) as covered by Items 1 to 85, inclusive, of the schedule of Specifications No. 570, Columbia Basin Project, Wash., for the estimated consideration of $29,339,301.50, dependent upon final quantities of work performed, in strict accordance with the specifications, schedules, and drawings. This amount was exclusive of materials which were to be furnished by the Government. The contract and specifications are in evidence and are made a part hereof by reference.

3. The schedule attached to Specifications No. 570 (pages 3 to 12, inclusive) contains 85 separate items of work. The prices for which the work was to be done, Except Items 1, 83, 84, and 85, were unit prices for designated units of measurement and estimated quantities, the ultimate price to depend on the actual number of units. The prices for the four items mentioned were lump-sum prices for all of the work covered thereby.

Paragraph 5 of Specifications No. 570 reads as follows: "Quantities and unit prices.—The quantities noted in the schedules are approximations for comparing bids, and no claim shall be made against the Government for excess or deficiency therein, actual or relative. Payment at the prices agreed upon will be in full for the completed work and will cover materials, supplies, labor, tools, machinery, and all other expenditures incident to satisfactory compliance with the contract, unless otherwise specifically provided."

4. The Grand Coulee dam was built aross the Columbia River about 95 miles west and north of Spokane, Wash. Of all the rivers in the United States, the Columbia River is exceeded only by the Mississippi River in volume of water carried. In potential power the Columbia River far exceeds that of any other river in the United States, and has within it one-sixth of all the hydroelectric power possible of capture in the entire country. Much of the water in this river comes from the melting snow and ice of the Canadian Rockies, with the result that high water occurs during the months of May and June at a time when the water of all other rivers in the country usually is low. The water impounded by the high dam (finding 13) extends 151 miles to the Canadian border. At the dam site the river flows north, although its general direction in that area is southwest.

5. The contract required that the work commence within 30 days after receipt of notice to proceed and be completed within 1,650 calendar days from the date of receipt of such notice. Notice to proceed was received by plaintiffs on September 25, 1934, thereby fixing the date of completion as April 2, 1939. Actual construction work started October 4, 1934, and the contract was completed and accepted by the defendant on March 21, 1938, one year and 12 days prior to the contract completion date.

6. The office of the contracting officer was in Denver, Colo., and he was rarely at the site of the work. F. A. Banks, construction engineer and representative of the contracting officer on the job, was on

the site for some time prior to the letting of the contract and was there continuously during the performance of the work.

7. Before the contract was let the nearest railroad to Grand Coulee dam was about 30 miles south through a station named Coulee City, on the Northern Pacific Railroad. There were practically no houses near the site of the dam to accommodate the great number of workmen to be employed on the dam. Plaintiffs first built a town for the accommodation of its workmen on the east side of the river just below the dam, called Mason City, which was known as the contractor's town. This required about three months, and by the first of the year 1935 the town was well occupied by plaintiffs' employees, who at the peak were over 5,000, working in three 8-hour shifts daily, from 12 midnight to 8, the graveyard shift; from 8 to 4, the day shift; and from 4 to 12, the swing shift. To house the defendant's employees of between 500 and 1,000, the defendant built a town on the west side of the river just below the dam, called Grand Coulee Dam, which was known as the Government town.

8. The contractor's plans required the construction of a west cofferdam, an east cofferdam, and cross-river cofferdams. The plan was to build the west abutment within the west cofferdam and then after that abutment was built to cofferdam up and down stream and turn the water over the west abutment. By June, 1935, the west cofferdam had been completed and a large amount of earth excavation and some rock excavation had been done within this cofferdam. There had also been some rock excavation in the east abutment area. At the time of the change order, June 5, 1935, referred to in finding 11, plaintiffs had much equipment on the site, had more than 3 million dollars invested in the job, and also had large commitments outstanding.

9. Paragraph 18 of Specifications No. 570 reads in part as follows: "Description of dam.—The general plan for the Grand Coulee dam provides for progressive development involving two principal stages of construction and the successive installation of power units. Plans for the ultimate development include a concrete straight-gravity dam about 500 feet high above the lowest point in the foundation, with a crest length of about 4,000 feet, and a power plant containing eighteen 105,000 kilowatt units. The river channel section of the dam will have an overflow spillway 1,800 feet long, at each side of which, and immediately below the dam abutments, 9 units of the power plant will be installed. The first development, which is covered by these specifications, includes the main portion of the excavation for the high dam, the construction of a concrete straight-gravity dam to an elevation about 200 feet below that planned for the high dam, construction of a permanent downstream cofferdam, and the construction of a power plant at the extreme left of the dam, as shown on the drawings. The permanent cofferdam, located below the toe of the low dam, will be constructed to form the toe of the high dam and the downstream portions of future powerhouses. * * *"

10. Paragraph 25 of Specifications No. 570 reads in part as follows: "Termination of contract.—If at any time within the contract period, the construction of the Grand Coulee dam to the full height contemplated for the ultimate development of the project is authorized, the Government shall have the right to terminate the contract under these specifications upon thirty (30) days' notice in writing to the contractor, and, in such event, the contractor shall turn over to the Government, free of encumbrance, all plant, tools, and equipment of the contractor, including camp and appurtenances, which are installed at the time of such termination or contracted for in writing, in use or to be used exclusively in the work under these specifications, and, at the option of the contractor, shall include consumable supplies of the contractor, on hand or in transit on the date of the notice of termination, including explosives, fuel, lubricants, and materials of construction not incorporated in the work, but shall not include commitments for the purchase of consumable supplies or construction materials extending beyond the date of the notice of termination. If the contract is thus terminated by the Government the total payment made to the contractor under the contract shall be the total actual cost, less revenues from rentals, leases and concessions, incurred by the contractor to the date of such termination, including labor, plant, tools, equipment, overhead costs, and such consumable supplies as may be turned over to the Government as herein provided, plus ten (10) percent of such total cost * * *."

11. Paragraph 24 of Specifications No. 570 provided as follows: "Right to change

location and plans.—When additional information regarding foundation or other conditions becomes available as a result of the excavation work, further testing, or otherwise, it may be found desirable to change the location, alignment, dimensions, or design of the dam or power plant to meet such conditions. The Government reserves the right to make such reasonable changes as, in the opinion of the contracting officer, may be considered necessary or desirable, and the contractor shall be entitled to no extra compensation because of such changes, except that any increase in the amount of excavation, concrete, or other required work, for which items are provided in the schedule, will be paid for at the unit prices bid therefor in the schedule. The contractor's plant shall be laid out and his operations shall be so conducted as to accommodate any reasonable change in the location and design of the dam and power plant, or any part thereof, without additional cost to the Government."

Some time during the spring of 1935 the contracting officer decided to construct Grand Coulee Dam to its full height and discussed a change order with plaintiffs. On June 5, 1935, a change order, designated as Order for Changes No. 1, with accompanying drawings, was sent to plaintiffs.

Plaintiffs' original contract was for the construction of the low dam, which was the first development of the ultimately projected high dam, and was described in paragraph 18 of the specifications set out in finding 9. Change Order No. 1 abandoned the construction of the low dam and directed plaintiffs to construct the lower part of the high dam. The part of the high dam that plaintiffs were directed by the change order to construct was a structure of a greater magnitude than the structure provided for in plaintiffs' original contract, and the change ultimately increased the money consideration paid to plaintiffs under the contract to approximately $40,000,000, exclusive of material furnished by the defendant. Plaintiffs immediately proceeded to work in compliance with the change order. The change order is in evidence and is made a part of these findings by reference. The first two and the last two paragraphs thereof read as follows:

"Additional information having become available it is found desirable, in pursuance of the provisions of Article 4 of the contract with you dated July 16, 1934 (Symbol No. 1–2r–4359), and in pursuance of the provisions of paragraph 24 of specifications No. 570 forming a part thereof, to change the dimensions and design of the Grand Coulee Dam and power plant to meet such conditions. In the opinion of the contracting officer those changes are necessary and desirable.

"In lieu of constructing the Grand Coulee Dam and the appurtenant works in accordance with the drawings and specifications No. 570 you are directed to construct the dam and appurtenant works in accordance with the revised designs as shown on the attached general drawings Nos. 222–D–751, 752, and 753. Other drawings showing additional details will be furnished for construction purposes. The principal changes involved are as follows:

\* \* \* \* \* \* \*

"All work shall be done under the detailed instructions contained in specifications No. 570 where these are applicable as determined by the contracting officer and otherwise in accordance with the detailed instructions and drawings which will be furnished by the contracting officer.

"Compensation for the work involved as a result of this order shall be made in pursuance of the provisions of paragraph 24 of specifications No. 570 and (or) the provisions of Article 4 of the contract. The time within which to submit claims for adjustment of compensation shall be 60 days from the date of receipt of this order, unless the contracting officer for proper cause shall extend such time."

12. On August 23, 1935, plaintiffs submitted their claim for adjustment of compensation. Negotiations between representatives of the plaintiffs and of the defendant for an adjustment of compensation were carried on until December, 1935. On December 8, 1935, the contracting officer, R. F. Walter, issued an Adjustment of Compensation. This document was accepted and signed by each of the plaintiffs before the end of December, 1935. The work that plaintiffs completed on March 21, 1938, referred to in finding 5, was the work under the original contract as modified by Order for Changes No. 1 and other work orders issued from time to time during the progress of the work under plaintiffs' contract.

13. The contract work was carried on efficiently and expeditiously with only partial interruptions during periods of severe

cold weather. By the end of November, 1937, plaintiffs' contract was approximately 97 percent completed. On December 10, 1937, bids for "Completion of Grand Coulee Dam, Power House and Pumping Plant," under Specifications No. 757 were opened. February 7, 1938, Consolidated Builders, Inc., organized by Henry J. Kaiser, entered into a contract with the United States for the completion of the Grand Coulee Dam, which, completed in 1941, is 500 feet wide at the base, 550 feet high and 4,300 feet long at the crest, and is the largest man-made structure in the world. The dam contains 10,500,000 cubic yards of concrete, of which plaintiffs placed 4,524,000 cubic yards.

14. Certain articles of the plaintiffs' contract read as follows:

"Art. 3. Changes.—The contracting officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and (or) specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. No change involving an estimated increase or decrease of more than $500 shall be ordered unless approved in writing by the head of the department or his duly authorized representative. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered, unless the contracting officer shall for proper cause extend such time, and if the parties cannot agree upon the adjustment the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.

"Art. 4. Changed conditions.—Should the contractor encounter, or the Government discover during the progress of the work, subsurface and (or) latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they materially differ from those shown on the drawings or indicated in the specifications, he shall at once, with the written approval of the head of the department or his representative, make such changes in the drawings and (or) specifications as he may find necessary, and any increase or decrease of cost and (or) difference in time resulting from such changes shall be adjusted as provided in article 3 of this contract.

"Art. 15. Disputes.—All labor issues arising under this contract which cannot be satisfactorily adjusted by the contracting officer shall be submitted to the Board of Labor Review. Except as otherwise specifically provided in this contract, all other disputes concerning questions arising under this contract shall be decided by the contracting officer or his duly authorized representative, subject to written appeal by the contractor within 30 days to the head of the department concerned or his duly authorized representative, whose decision shall be final and conclusive upon the parties thereto as to such questions. In the meantime the contractor shall diligently proceed with the work as directed."

15. Paragraph 14 of Specifications No. 570 reads as follows: "Protests.—If the contractor considers any work demanded of him to be outside the requirements of the contract, or considers any record or ruling of the contracting officer or of the inspectors to be unfair, he shall immediately upon such work being demanded or such record or ruling being made, ask for written instructions or decision, whereupon he shall proceed without delay to perform the work or to conform to the record or ruling, and, within ten (10) days after the date of receipt of the written instructions or decision, he shall file a written protest with the contracting officer, stating clearly and in detail the basis of his objections. Except for such protests or objections as are made of record in the manner herein specified and within the time limit stated, the records, rulings, instructions, or decisions of the contracting officer shall be final and conclusive. Instructions and/or decisions of the contracting officer contained in letters transmitting drawings to the contractor shall be considered as written instructions or decisions subject to protest or objection as herein provided."

16. During the progress of the work plaintiffs' representatives often discussed matters of controversy arising during the progress of the work or complained orally to the inspectors and the construction engineer regarding the manner in which the

inspection was conducted, or alleged extra contractual requirements. When such discussion or oral complaints were made, it usually resulted in the construction engineer and an officer or officers of the plaintiffs meeting to thresh matters out and to settle the controversy. Sometimes an agreement was reached and at other times not. On a few occasions when no agreement was reached plaintiffs notified the construction engineer that claims for damages would be made. These complaints and discussions were more or less informal, without attempting to comply with the limitations prescribed in Paragraph 14 of Specifications No. 570; and, with few exceptions, no appeals were taken within the 30-day period provided in Article 15, to the head of the department.

17. On November 22, 1937, plaintiffs submitted to the Secretary of the Interior, who was the head of the department which had made the contract, a number of claims for additional compensation. These claims were referred by the head of the department to the contracting officer, to whom, under Article 15 of the contract, the head of the department thought they should have been first presented. Up to February 14, 1938, there were presented to the contracting officer 28 claims for additional compensation, including the claims of November 22, 1937. All these claims were originally involved in this suit. Some of them have now been abandoned. Subsequent to the submission of the detailed statement on all the claims on February 14, 1938, plaintiffs submitted to the contracting officer statements of damage on each of the claims at various dates from March 4, 1938, to May 3, 1938.

18. The findings of fact and decisions of the contracting officer on plaintiffs' 28 claims were made on December 5, 1938, and on the following day his findings were sent to counsel for plaintiffs. They are in evidence as plaintiffs' Exhibit J, and are made a part hereof by reference. On each of the claims the contracting officer made findings of fact and a decision; and on each claim, except claims 13, 27, and 28, the contracting officer concluded his findings in the following language: "The contractor is entitled to no additional compensation by reason of this claim and the contractor's claim is denied."

As to claim 13, the contracting officer found the contractor entitled to remission of penalty of $1,099.80, but the balance of the claim was denied. Claims 27 and 28 were also denied.

19. The contracting officer did not refuse to consider any one of the 28 claims on the ground that plaintiffs did not make timely protest under paragraph 14 of Specifications No. 570. See finding 16. In some of the findings of fact on these claims the contracting officer referred to the exchange of letters and protests, giving dates, and using language which, in its context, showed that he meant that the plaintiffs had not complied with the requirements of the contract and specifications as to making timely protests. At no place did he specifically state in his findings on any claim that the claim was denied because of plaintiffs' failure to file a timely written protest.

20. After November 22, 1937, and before January 4, 1939, there was an exchange of letters and telegrams between counsel for plaintiffs and the Secretary of the Interior which contained the respective differing views of the parties as to the proper approach and speed for the consideration of the claims then pending before the contracting officers.

In a letter dated August 11, 1938, from plaintiffs' counsel to the Secretary of the Interior, in which counsel complained at being required to wait for a decision on the claims by the contracting officer, counsel said:

"This situation can be remedied by you and it is your duty to do so. You can appoint a representative to conduct a hearing and advise you as to the propriety of our claims. If this representative be not a lawyer himself, it is suggested that he be afforded competent legal advice and assistance.

"We respectfully insist that such a representative be appointed by you; that we be permitted to present to him our evidence of the facts and our views of the law and the contracting officer be permitted to do likewise; and that each party be permitted to hear and examine the other's witnesses."

21. January 4, 1939, counsel for plaintiffs wrote a letter to the Secretary of the Interior, as follows:

"For and on behalf of Silas Mason Company, Inc., Walsh Construction Company and Atkinson-Kier Company, contractors for the first unit of the Grand Coulee Dam (Symbol No. 12r–4359), appeal is hereby taken to you as Secretary of the Interior

from the 'Findings of Fact' of the contracting officer.

"The 'Findings' ignore pertinent and controlling facts, contain frequent misstatements of fact, are so vague as to make their intent and meaning a matter of conjecture and are predicated upon many misconstructions of the contract. The 'Findings' so far exceed the ordinary bounds of legal consideration as to constitute them arbitrary and capricious action on the part of the officer responsible therefor.

"This appeal is taken without recognition of any supposed requirement therefor and with full reservation of the contractor's rights to have all issues adjudicated by the proper courts. In view of the protracted delay of the contracting officer in making these 'Findings' it is respectfully requested that disposition of the several questions be expedited."

22. January 19, 1939, the Secretary of the Interior wrote a letter to counsel for plaintiffs, as follows:

"I have received your letter of January 4 which is in the nature of an appeal from the decision of the contracting officer on the claims made by Silas Mason Company, Walsh Construction Company, and Atkinson-Kier Company pursuant to their contract, symbol 12r–4359, dated July 16, 1934, for the construction of the first unit of the Grand Coulee Dam. You allege that the action of the contracting officer in making his decisions on the 28 claims filed by you was arbitrary and capricious.

"If you desire to submit additional evidence or argument upon the claims, please advise us. In the absence of advice to that effect, the findings of the contracting officer will be carefully reviewed on the basis of the record now before the Department."

23. Thereafter, plaintiffs' counsel, by letter of January 26, 1939, requested a conference with the Secretary of the Interior with reference to the procedure to be followed on the appeal. This letter was referred by the Secretary to Mr. Margold, the Solicitor of the Department of the Interior, with instructions to consider the appeal and the evidence submitted in support thereof, and make a report thereon to the Secretary for his consideration in making his final decision in the matter.

Thereafter, on February 6, 1939, plaintiffs' counsel called upon Mr. Margold and demanded of him the right to present oral evidence in support of the claims of his clients, as well as the right to cross-examine the contracting officer and any of his staff who had knowledge of the claims or who had advised with the contracting officer in connection therewith. This demand was confirmed by letter of February 7, 1939. Plaintiffs stated at that time that it would take at least 6 weeks to complete the testimony which the plaintiffs intended to offer on their behalf.

By letter dated February 11, 1939, from Solicitor Margold, plaintiffs were accorded the privilege, without qualification, of presenting oral testimony in support of their claims, together with the privilege of cross-examining such witnesses as defendant might produce. By the same letter the Solicitor advised plaintiffs that unexpected circumstances required that he leave for California on official business immediately for a period of several weeks, but that his assistant, together with a representative of the Department of Justice, both of whom were designated by name, could arrange the details of the hearing. It was intended at that time that a lawyer from the Department of Justice should present the Government's opposition to the claims at the hearing. The Department of Justice declined to participate in such an administrative hearing, and the plaintiffs were so advised.

March 9, 1939, the Acting Secretary of the Interior wrote to plaintiffs' counsel a letter which concluded as follows: "It appears that there now exists no reason why a date may not be set for the inauguration of the hearing. Accordingly, in the near future you will be notified by the Solicitor as to a date which is agreeable to him and advised as to the procedure which is deemed appropriate. Your desires with regard to any alteration in the established date, as well as any details concerning the procedure to be followed, will, of course, be given full consideration."

No further communication or inquiry passed between plaintiffs' counsel and the Department of the Interior until May 1, 1939.

24. May 1, 1939, counsel for plaintiffs wrote a letter to the Secretary of the Interior, as follows: "With reference to the claims of the joint contractors for the construction of the First Development of the Grand Coulee Dam we beg to advise you that the contractors, compelled by the adverse attitude and the long-continued fail-

ure of the head of the Department to proceed to effect action (a situation which, by reason of being superimposed upon the arbitrariness and dilatoriness of the contracting officer, the more clearly reveals the futility of further efforts for redress by you) have this day filed suit against the United States in the Court of Claims."

25. May 24, 1939, the Secretary of the Interior wrote a letter to counsel for plaintiffs, the last two paragraphs of which follow:

"You were advised by the Solicitor for this Department by letter dated February 11, and also by the letter of the Acting Secretary of the Interior dated February 25, that the contractors represented by you were granted a full and complete hearing on all of their claims and were given the right to produce witnesses and documents and take testimony in the hearing and cross-examine such witnesses as the Government might produce and that Mr. Margold, the Solicitor for the Department, would conduct the hearing for me and report the facts to me. This was repeated to you in subsequent correspondence. During the course of the conversation with the Solicitor of this Department you stated that it would probably take six weeks properly and fully to present your case. On March 9 you were informed by letter that upon Mr. Margold's return to Washington he would arrange a time for the hearing.

"Inasmuch as you have commenced an action in the Court of Claims, involving the same items as those embodied in your claim before the Department, before I have had sufficient opportunity either to arrange for such a hearing as you requested or to review the findings of the contracting officer, and in view of the conditions upon which your so-called appeal was presented, it is assumed that you have elected to forego whatever rights you may have by way of appeal to me from the contracting officer's decision under Article 15 of the contract, and that no further action by me will be necessary in the matter."

This letter was not answered and no further action was taken by the Secretary of the Interior on the appeal. Plaintiffs' petition was filed in this court on May 1, 1939.

26. It has not been proved that the conduct of the contracting officer was arbitrary or capricious or lacking in good faith.

We make no finding as to whether or not his decisions were correct.

The Secretary of the Interior, who was the head of the department mentioned in Article 15 of the contract, did not refuse or fail to entertain an appeal by the plaintiffs from the decisions of the contracting officer. The postponement of the beginning of hearings on the appeal which occurred in the early months of 1939 was not, in the circumstances, unreasonable or inconsiderate of plaintiffs' interests.

27. Plaintiffs' petition sets out 31 different causes of action covering 28 claims presented to the contracting officer. Three of the claims were each divided into two causes of action, which accounts for there being three more causes of action than there were claims. Causes of Action Nos. 27 and 31 were withdrawn before the hearings began before the commissioner of this court. Causes of Action Nos. 22, 24, 25, and 26 have now been abandoned.

28. A part of plaintiffs' fourteenth cause of action was for the recovery of $1,099.80 which had been deducted, as liquidated damages, from compensation otherwise due them. The contracting officer in his decision of December 5, 1938, decided that the plaintiffs were entitled to this money. It has not been paid to plaintiffs.

29. The plaintiffs' thirtieth cause of action is to recover $125,120 withheld by the Government from moneys otherwise due the plaintiffs, in connection with a controversy concerning the adequacy of drainage facilities under plaintiffs' waste dump in Rattlesnake Canyon. The plaintiffs were permitted to dump waste in the canyon on condition that they place a drain pipe under the waste which would allow water to flow out of the canyon and not collect in it, which, if it occurred, might cause the waste to slough into the river. In November, 1934, the plaintiffs placed a 60-inch galvanized corrugated iron pipe in the bottom of the canyon and began to dump waste on it. In 1935 the pipe collapsed. There was a dispute as to whether the collapse cut off all drainage and as to whether there was enough water in the canyon to worry about. The contracting officer requested the plaintiffs to install new drainage facilities but they never did so. At the time the plaintiffs finished their work the controversy was still unresolved, no damage had resulted, but whatever danger there had been of waste sloughing into the river still existed. The contracting officer deducted

$125,120 from the plaintiffs' money, to put the Government in funds to install the drainage. In his decisions of December 5, 1938, he denied the plaintiffs' claim for this money, apparently on the ground that the Government was going to use it to install the drainage. This has never been done, and, as matters now are, since completion of the dam, the expenditure of the money for that purpose would be unnecessary and useless.

Samuel T. Ansell, of Washington, D.C. (Ansell, Ansell & Marshall, of Washington, D. C., on the brief), for plaintiffs.

John B. Miller, of Washington, D.C., and Francis M. Shea, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES and MADDEN, Judges.

MADDEN, Judge.

The plaintiffs, three firms of contractors, made a contract with the Government on July 16, 1934, for the construction of the "first development" of the Grand Coulee Dam and Power Plant on the Columbia River in the State of Washington. The consideration was an estimated one of $29,-339,301.50, the actual payments to depend on the number of units of excavation, concrete, etc., the plaintiffs having bid certain prices per unit of work. Work was begun in October, 1934. Early in 1935 the Government decided that the dam should be built to its full ultimate height, and by a change order assigned to the plaintiffs the job, considerably larger than the one for which they had contracted, of building the lower part of the ultimate complete project. The plaintiffs were paid approximately $40,000,000 for their work as so changed. It was intended that another contract would be let for the completion of the project so that that work could follow the plaintiffs' completion of its job.

The plaintiffs completed their work on March 21, 1938, one year and twelve days before the date set in the contract. Another contractor got the contract for the building of the rest of the project and completed it in 1941. The dam is 500 feet wide at the base, 550 feet high, and 4,300 feet long at the crest. It is the largest man-made structure in the world. It impounds the water of the Columbia River for 151

miles, to the Canadian border. It contains 10,500,000 cubic yards of concrete, of which the plaintiffs placed 4,524,000 cubic yards.

The plaintiffs worked more than 5,000 men at the peak of the work in three shifts. The Government had from 500 to 1,000 employees at the job. Discussions and controversies occurred as to whether the Government was, in its inspections and directions, requiring more of the contractors than the contract called for, or otherwise impairing their rights. Many of these controversies were settled at the site of the work. The contracting officer designated in the contract to act for the Government was the Chief Engineer of the Bureau of Reclamation, whose headquarters were in Denver. He was not often at the site of the work, where a "construction engineer" was in charge for the Government. The plaintiffs' job superintendent did not pay much attention to the provisions of the contract papers that protests concerning matters in controversy be made promptly and in writing. Such written protests as he made concerning the matters here in litigation were temperate and well stated.

In November, 1937, when the work was substantially completed, some 93 percent of the concrete having been poured, the plaintiffs addressed two communications to the Secretary of the Interior, who was the head of the department which had jurisdiction of the building of the dam. The second of these letters, dated November 22, contained an appendix setting forth sixteen items of claimed breaches of contract by the Government. The claims were based on asserted arbitrary and unreasonable requirements and interpretations made by the contracting officer and his subordinates during the course of the work, which had increased the costs of performance or had denied compensation to the plaintiffs for work done. On November 26 the plaintiffs' counsel requested of the Secretary an opportunity to discuss the claims orally with him. On December 18 counsel was informed that under the provisions of the contract the claims had to be submitted to the contracting officer for his decision, and that the claims previously sent by the plaintiffs to the Secretary had been forwarded by him to the contracting officer with directions that he proceed with them under Article 15 of the contract.[1] The letter suggested that any additional claims

---

[1] The article is quoted in full in finding 14.

be sent directly to the contracting officer. On December 21, counsel replied that plaintiffs had not in terms invoked Article 15 because, in their view, it was "without binding force and effect in respect of the matters we have presented"; that the plaintiffs did desire, however, to try to reach a satisfactory administrative settlement; that "the methods and procedure to be adopted and the officials to be designated for bringing these matters under full and fair departmental consideration are, of course, for your determination;" but that "We assume that such methods and procedure will accord us a full and fair opportunity to be heard in person and by counsel and other representatives, and, upon such assumption, we shall be pleased to participate in such hearings in a spirit of helpful cooperation."

Apparently because of the plaintiffs' non-recognition of the validity of Article 15, they sent ten additional claims direct to the Secretary, who forwarded them to the contracting officer and so advised the plaintiffs. Between February 14 and April 13, 1938, three additional claims, and additional details in support of the claims previously filed, were filed with the contracting officer. Between March 4 and May 3 statements of the amounts of damages claimed, under all of the claims previously filed, were submitted. The amount involved in the claims sued for here is $5,283,526.28.

The plaintiffs' counsel sought to have the contracting officer hear witnesses and counsel on behalf of the plaintiffs and give plaintiffs' counsel an opportunity to examine the Government's witnesses. The contracting officer denied these requests, and ultimately made his findings and decisions on the basis of the detailed statements of the plaintiffs in support of their claims, and the information which was available to him from the files of the job and his observation of the work as it progressed. Beginning with a letter of July 14, 1938, plaintiffs' counsel complained bitterly to the Secretary about the proposed procedure of the contracting officer, and what counsel asserted as the contracting officer's intention to delay action on the claims, and his intention to decide them adversely to the plaintiffs. Counsel, in the first of these letters on July 14 requested the Secretary to direct the contracting officer "to submit to you his findings of fact together with all pertinent matters within sixty days from today, a period of time which we believe to be amply sufficient for that purpose."

Counsel was advised that inquiry would be made as to whether the findings could be made within sixty days. On August 11 counsel repeated his earlier complaints and told the Secretary that it was his duty to appoint a representative other than the contracting officer to hear the claims and said: "We respectfully insist that such a representative be appointed by you; that we be permitted to present to him our evidence of the facts and our views of the law and the contracting officer be permitted to do likewise; and that each party be permitted to hear and examine the other's witnesses."

Counsel was advised that every effort was being made to expedite the findings, but that the claims were extensive and the amounts involved were large. Another letter from counsel on October 12 was followed by a long telegram on October 23 to the Secretary addressed to a hotel in Portland, Oregon, where he seems to have been stopping in the course of a trip. The telegram was highly accusatory of the contracting officer, and contained the statements: "When the findings of fact are made they will as such be inherently worthless. * * * There can be no justification for the procedure being used by Mr. Walter: It is clearly a 'defense preparing' and not a 'fact finding' procedure." It again requested the Secretary to appoint a representative "whose duty it shall be to conduct a full and fair hearing and advise you of the merits of our claims."

The Secretary's response, also by telegram, was in bad temper. It took exception to counsel's assumption that his claims had been prejudged, and to his accusations of derelictions of duty on the part of persons in the department. It then indulged in a wholly irrelevant and improper reflection upon counsel with regard to using experience gained in former service of the Government for his personal benefit. There was some further correspondence between the Secretary and counsel relating to the exchange of telegrams. The contracting officer's findings were issued on December 5, 1938.

In the several communications addressed to the Secretary by counsel for plaintiffs while the claims were pending before the contracting officer, various statements were made concerning the purpose of the contracting officer, Mr. Walter, to construct a

defense to the plaintiffs' claims rather than to consider them on their merits. These statements all relate, apparently, to the same incident. The only sworn testimony relating to the incident is the answer "They are" made by plaintiffs' counsel from the witness stand to the question addressed to him by other counsel for plaintiffs, "Are the things stated in your letters as occurring between you and officials of the Government true?" The question related to plaintiffs' Exhibit I, a large compilation of correspondence. Because of the seriousness of the charge against the contracting officer, who, we are told, had died before the hearing, and the cryptic manner in which the charge was supported by the testimony, the matter needs careful examination. In the plaintiffs' exceptions to the commissioner's report, at page 302 of the record, occurs this statement, with no citation to any testimony or exhibit: "(e) On July 2, 1938, counsel and other representatives went to Denver and conferred with Mr. Walter and his first assistant urging action on the claims by the contracting officer and an early hearing. At that conference the contracting officer acquiesced in the statement of his assistant that any hearing upon matters of fact or law was superfluous and that time was necessary to prepare the best possible defense against the claims."

In counsel's letter of October 12, 1938, to the Secretary, at page 252 of plaintiffs' Exhibit I, in giving a chronological story of relevant incidents, counsel says, inter alia:

"On May 19, 1938, we again went to Denver and conferred with Mr. Walter in an effort to obtain action.

"On June 30, 1938, we went to the Grand Coulee Dam, where Mr. Walter then was, and made the same effort.

"On July 2, 1938, the same trip. We also went to Denver and saw Mr. Harper, Mr. Walter's chief assistant, on the same question."

In counsel's letter of July 14, 1938, at pages 243, 244 of plaintiffs' Exhibit I, counsel says: "The contracting officer has clearly indicated that he regards any hearing from us upon matters of fact or of law as unnecessary and superfluous and that it is his intention to construct such defense against the claims as the evidence available to him, but not to us, may seem to him to justify."

In counsel's exceptions, at page 303 of the record, he says of the Secretary's testimony: "* * * nor did he know that Mr. Walter had said that time was necessary to prepare the best defense possible. * * *"

In counsel's letter of August 11, 1938, to the Secretary at page 247 of plaintiffs' Exhibit I, counsel says: "* * * We have been advised by the contracting officer's representative at the dam site that 'the time is necessary to prepare the best defense possible.' It does not inspire confidence in departmental procedure as a means to settle claims, to observe a government officer charged by you to 'find facts,' devoting his time to creating the 'best defense.' However, this is in accord with the attitude of the contracting officer throughout the life of the contract."

In counsel's letter of October 12, 1938, at pages 251, 252 of plaintiffs' Exhibit I, occurs this statement: "Mr. Banks, the contracting officer's representative at the dam, was present at that conference." This is the same letter referred to above which recited a conference in Denver with Mr. Harper, Mr. Walter's chief assistant, to whom plaintiffs' statement on page 302 of the record, also quoted above, attributes the statement about preparing a defense.

In counsel's telegram of October 23, 1938, to the Secretary, he makes this statement, at page 259 of plaintiffs' Exhibit I: "Mr. Walter has advised us that * * * it is his intention to construct such defense against the claims as the evidence available to him, but not to us, may seem to him to justify."

Upon the basis of the foregoing assortment of inconsistent statements, all supposed to be verified by the brief response "They are," to the question whether they, as well as other contents of a collection of correspondence, were true, we are asked to find intentional and gross dereliction of duty on the part of a public officer now dead. We could not possibly make such a finding.

As we have said, the contracting officer issued his findings on December 5, 1938. They comprise a large volume, plaintiffs' Exhibit J, but by far the greater part of the volume consists of copies of the plaintiffs' claims and supporting statements. The study of the problems involved and the preparation of the decisions would, however, have taken a good deal of time. As the plaintiffs knew when they agreed

to submit their claims to him, his principal job was that of being Chief of Engineers of the Bureau of Reclamation, and his decision of claims such as these would have to be done, within reason, without too greatly interrupting his current work. We think the plaintiffs' impatience was largely due to the fact that they had been advised by counsel that, although they had agreed to submit these claims to the contracting officer, their agreement was not binding, and their having to do so was only an irritating delay. Counsel was desirous of getting the claims before some other person in the department, preferably a lawyer, who had had no previous connection with the problems and could therefore reach an independent judgment. This desire is entirely understandable. The impediment to it was that his clients had agreed to something quite different, with full knowledge that the contracting officer who would decide their claims in the first instance under Article 15 would be the same person who had already, while the job was in progress, taken a position on most of them. It was natural that counsel's repeated castigations of the very procedure to which his clients had agreed, and of the officials who regarded themselves as bound by that agreement, though counsel did not, produced an accumulation of annoyance which resulted in an explosive, and, in part, improper, communication.

The Government contends that the plaintiffs neglected to file written protests within the short period set by the contract, and are, for that reason, barred from recovery. It is suggested that the contracting officer, by accepting and passing on the claims, though presented late, waived the defense. The contracting officer's findings, in some instances, made pointed references to the lateness of the filing, showing that he was aware of the provision of the contract and that it had not been fulfilled. He stated no final grounds upon which he placed his denial of the claims, which were all denied except one small one, so it cannot be determined whether lateness of protest was a ground of any of his decisions. In view of what we conclude hereinafter concerning the appeal to the head of the department, it is not necessary to decide and we do not decide whether the claims were made late and, if so, whether there was an effective waiver of the lateness.

As we have said, the contracting officer issued his findings on December 5, 1938. On January 4, 1939, the plaintiffs took an appeal to the head of the department, the Secretary, though restating their position that they were not bound by Article 15, which accorded finality to the decision of that official. The Secretary on January 19 offered counsel the opportunity to present additional evidence or argument. Counsel on January 26 asked for a personal conference with the Secretary. The Secretary arranged for a conference with Solicitor Margold, which counsel had on February 6. On February 7 counsel wrote the Secretary criticizing the procedure which, he said, the Solicitor had proposed. This may have been due to a misunderstanding, but in any event the Solicitor wrote counsel on February 11, advising him that "circumstances have unexpectedly arisen which require me immediately to leave Washington for California and may delay my return for a few weeks", and further saying, inter alia: "I have decided to grant, without any qualification, the request which you made during your personal conference with me last Monday for a full and complete hearing of the merits of this controversy. You will be at liberty fully to present all the oral and written testimony you deem pertinent to your case and to cross-examine any witness or witnesses that may be offered on behalf of the Government."

The Solicitor hoped that the Department of Justice would be willing to present the Government's side of the case in the hearing, and he advised counsel in his letter that "it seems likely that the proposed arrangement can be effectuated." Counsel replied to the Solicitor on February 16 quoting the Solicitor's statement as to proposed procedure and saying: "We have the honor to inform you, and we have also advised the Secretary of the Interior, that your decision as above quoted is entirely agreeable to us."

When counsel for plaintiffs visited the Department of Justice to arrange for the hearings he was advised that that Department would not take part in the hearings except that an attorney could "attend the hearings in the capacity of an observer and as an adviser of the Department as to whether the procedure accorded to our clients the rights to which the Department of Justice may believe them to be entitled under the contract." The language just

quoted is from a letter of plaintiffs' counsel to the Acting Secretary of the Interior, dated February 27. That letter then said: "We feel it our duty to say that the net result of our long-continued efforts to be granted a full and fair hearing and to be advised of the procedure instituted in the Department is essential to a full and fair hearing is the statement by the Solicitor in his February 11th letter that he has decided to grant without any modifications the request made by us for a full and complete hearing of the merits of this controversy. As stated in our letter to the Secretary of February 7th the procedural elements are of the highest importance as essentials of a full and fair hearing. It is our view that to establish essential procedure is an obligation laid upon the Department and that its failure to perform that obligation constitutes in effect a denial to us of a full and fair hearing to our great injury."

On March 9, the Acting Secretary wrote counsel saying, inter alia:

"* * * I am unable to see that the result of your conference with officials of the Department of Justice as outlined in your letter in any way affects the hearing which is being accorded you, except insofar as it concerns the establishment of a date for such hearing.

"It appears that there now exists no reason why a date may not be set for the inauguration of the hearing. Accordingly, in the near future you will be notified by the Solicitor as to a date which is agreeable to him and advised as to the procedure which is deemed appropriate. Your desires with regard to any alteration in the established date, as well as any details concerning the procedure to be followed, will, of course, be given full consideration."

Solicitor Margold did not return to Washington until May 11. There having been no communication between the parties or inquiry by plaintiffs' counsel from March 9 to May 1, 1939, the plaintiffs on the latter date filed their original petition, of seventy-six printed pages, in this suit, and counsel wrote the Secretary that they had done so, saying, "With reference to the claims of the joint contractors for the construction of the First Development of the Grand Coulee Dam we beg to advise you that the contractors, compelled by the adverse attitude and the long-continued failure of the head of the Department to proceed to effective action (a situation which, by reason of being superimposed upon the arbitrariness and dilatoriness of the contracting officer, the more clearly reveals the futility of further efforts for redress by you) have this day filed suit against the United States in the Court of Claims."

■ Upon the facts recited above, we think that the plaintiffs abandoned, without justification, the administrative procedure which they had, in their contract, agreed to follow. They are not, therefore, entitled to sue here. There was nothing in their dealings with Solicitor Margold which gave them reason to suppose that they would not be accorded a full and fair hearing, and within a reasonable time. In his letter of February 11 he had told their counsel that he had been called away and would not be back for a few weeks. For a "few" weeks to turn out to be eleven, the time between February 11 and May 1, when counsel filed this suit, is not so unusual in the experience of lawyers that counsel had any reason to suppose that the delay indicated a repudiation by the Solicitor of his agreement to conduct a hearing, and to proceed upon that supposition without any inquiry as to what the facts were.

It cannot be validly urged that the plaintiffs were excused from persisting in their appeal to the Secretary by the acrimonious exchange of messages between the Secretary and plaintiffs' counsel. This exchange had taken place before counsel filed his appeal, and before he approved as "entirely agreeable" the proposed arrangement for the procedure in hearing the appeal. Counsel did not then think that the plaintiffs could not have a fair hearing on the appeal and, as we have concluded, nothing occurred thereafter which was a reason for changing that opinion.

■ We do not decide whether the Secretary's decision, if the plaintiffs had not abandoned their appeal to him, would or would not have been final, or would have foreclosed resort to this court on the merits of the claims. The plaintiffs agreed to submit their claims first to the contracting officer, and then, if they were dissatisfied with his decision, to the head of the department. They also agreed that the latter official's decision should be final. If, because of the statute defining the jurisdiction of this court, the agreement as to finality was not binding upon the plaintiffs, that fact would not invalidate the rest of the agreement, which could have a useful purpose without the provision for finality.

The Government had a right, and the plaintiffs had a right, if both were willing to agree to it, to keep their disputes out of litigation to whatever extent the law would permit. If they could be settled in the Department, by being brought to the attention of responsible officials, that would be desirable. Plaintiffs' counsel, though insisting from the outset of his connection with the case that Article 15 of the contract was not binding, pressed for an opportunity to bring his evidence to the attention of responsible officials of the Department. He had a right, under the agreement to do so, and the Government had a right that he should do so, to give it an opportunity to avoid the delay and expense of litigation. If, after this was done, the law, in spite of the agreement, still permitted litigation, that would not prove that the law frowned upon attempts, such as the plaintiffs made until they decided to abandon them, to keep their claims out of court, or upon agreements, such as Article 15, that such attempts would be made.

We recognize that there may be disputes to which, by fair construction of Article 15, it is not intended to apply. For example in the form in which Article 15 is frequently written, it applies only to disputes concerning "questions of fact." When so written, it would not, of course, bind the contractor to resort to, nor the Government to accord, administrative determination of disputes concerning questions of law. But Article 15 as written in the plaintiffs' contract applied, except as to labor issues not here involved, to "all * * * disputes concerning questions arising under this contract." We think, therefore, that the plaintiffs were required to submit all the disputes upon which this suit is based, to the stipulated administrative procedure. This is, of course, what plaintiffs insisted upon, though disclaiming any obligation to do so, until they abandoned the effort. They held the same view here expressed, that disposition of the disputes here involved could be made in the Department, and it would be useful and economical to dispose of them there, if possible.

The contracting officer decided that the plaintiffs were entitled to $1,099.80, which had been deducted, as liquidated damages, from compensation otherwise due them. See finding 28. Under Article 15 his decision was final, since only the contractor is given the right to appeal. The Government does not contest the correctness of the decision, and the plaintiff may recover this amount.

In the plaintiffs' thirtieth cause of action they sue for $125,120, which the contracting officer deducted from compensation otherwise due the plaintiffs, with the expectation that the money would be spent by the Government to repair the drainage facilities leading out of Rattlesnake Canyon. The facts are related in finding 29. The need for the repair did not develop, and it is now known, though it was not known when the contracting officer made his decision, that the repair will never be made. Since his decision must, to have been fair, have been based upon a mistaken assumption as to future events, and since to allow it to stand would leave the plaintiffs' money in the Government's treasury, we conclude that the decision was not intended to be, and was not, final, and the plaintiffs may recover the amount deducted. The plaintiffs did not lose their right in this claim by their failure to appeal from this decision, because the abandonment of the Government's intention to spend the money to repair the drainage facilities, which abandonment gave the plaintiffs a right to the money regardless of the merits of the controversy in other respects, did not occur until after the period for appeal had expired.

The plaintiffs may have a judgment for $126,219.80. It is so ordered.

JONES, J., took no part in the decision of this case.