Whitaker, Judge,
delivered the opinion of the court:
This is a suit for damages for alleged breaches by the defendant of a contract for the construction of the superstructures in the Harlem River Houses project in New York City. Plaintiff claims damages for delay, for the cost of work done as the result of alleged arbitrary and unreasonable demands of defendant’s inspector on the job, and for work done which plaintiff claims was in addition to that which it was required to do by the contract.
1. Its first claim, set forth in paragraphs 7 to 12 and 16 of its petition, is for damages for delay due to defendant’s alleged failure to deliver the site of the work to it at the time agreed, and to changes made in the foundation plans.
Plaintiff’s contract covered seven buildings. The foundations were constructed under a separate contract. Plaintiff’s work was to commence as the foundations for each building were completed. Plaintiff was directed to proceed with its work on the first two buildings on July 27,1936. The foundations for the other buildings were delivered to plaintiff on August 12 and August 25. Plaintiff made no protest against the time of their delivery, nor was any protest in order since they were delivered as contemplated by the contract.
But, even though there may have been some delay in the delivery of the buildings, plaintiff would not be entitled to recover under the decision of the Supreme Court in United States v. Foley Co., 329 U. S. 64. The defendant did not agree to deliver the buildings on any specific dates.
Both plaintiff’s contract and the contract for the foundation work contained the usual provisions authorizing the Government to make changes in the drawings or specifications. The changes made in the foundation contract were made pursuant to this provision. For any delay incident thereto the plaintiff is not entitled to recover under the decision in United States v. Rice, 317 U. S. 61.
*222 2. In paragraphs 13 and 14 plaintiff claims damages for delay in approval of its shop drawings for doors. The drawings as originally submitted did not comply with the specifications and they were not approved for that reason. Plaintiff insisted that they did comply, and the defendant finally, merely to prevent further delay in the matter, approved the drawings, although they did not comply with the specifications. Defendant was in no way responsible for the delay incident to the approval of these drawings.
3. Plaintiff’s chief complaint is that the defendant’s inspector made unreasonable demands upon it as a result of which it was required to do work not required by the contract. In its brief it confines itself to its complaints (1) of the inspector’s requirement with reference to the treatment of the concrete ceilings of the rooms, and (2) of his requirement for the installation of more rawl drives than were necessary in anchoring the plaster partitions, and (3) of his requirement that the plastered partitions be exactly plumb and true.
Plaintiff used great care in the construction of the concrete ceilings in the houses, but, notwithstanding this, the ceilings had the appearance of being fly specked after paint was applied to them. This was caused by pinholes in the concrete, which in turn are caused by air bubbles. It is impossible to avoid pinholes, even by the exercise of the greatest care, but, even so, these pinholes gave the ceiling a fly specked appearance, which, of course, was quite undesirable.
Such a ceiling did not comply with the provisions of the specifications. Paragraph 6 of section 3 of division XXYI, under the heading of “Paint,” provides for the elimination of the first coat of paint, known as the “plaster primer,” at the contractor’s option, if formula 10A was used, but it provides that if the first coat is omitted, “the contractor will be held responsible for lime burns or other blemishes that may show through the paint and he shall remedy same at his own expense to the entire satisfaction of the Contracting Officer.” Apparently, formula 10A was used, and the plaster primer was omitted. If the plaster primer had been used, these fly specks would not have appeared.
*223 Fly specks in the ceiling are undoubtedly blemishes, and these blemishes the contractor was expressly required to remove at its own expense. It did so by the application of sparkle, which is a combination of putty, plaster of Paris, and sometimes cement. The method of removing the blemishes was not prescribed, but their removal was required. We are of the opinion that plaintiff is not entitled to recover the cost thereof.
4. The specifications provided that the channel irons, to which the studs for the plastered partitions were attached, should be fastened to the floors and ceilings by bolts or nails, spaced not more than two feet on center. They provided, however, that in lieu of the use of bolts or nails, “other methods of securing studs to floors may be used, if approved by the contracting officer.” The contractor proposed to use rawl drives spaced two feet on centers, and submitted to the project manager a drawing showing the use of these rawl drives. This drawing was approved by the project manager.
The channel irons were of varying lengths from one foot to fifteen feet. Holes for the installation of the rawl drives had been placed in them at intervals of six inches. The contractor proposed to fasten these to the floor by putting the rawl drives in the center hole in the channel iron, and then working out toward the ends,- placing a rawl drive at two-foot intervals. The result of this was that any channel iron which was less than four feet in length would have in it but one rawl drive, and this one would be in the center.
Notwithstanding the fact that plaintiff’s drawing had been approved by the project manager, defendant’s chief inspector objected to this method of fastening the channel irons to the floors and insisted that a rawl drive be placed in the hole nearest each end and at intervals of not more than two feet. Although plaintiff protested against this to the project manager, and although the project manager stated to plaintiff that he had approved the drawing and would be responsible for it, defendant’s chief inspector still insisted on the placing of the rawl drives in the manner required by him, and plaintiff’s subcontractor was required to do so. It did so without protesting to the contracting officer.
*224 The method of construction demanded by the chief inspector necessarily produced a better job than that provided for in plaintiff’s drawings. A channel iron anchored to the floor by only one rawl drive was necessarily much less secure than one anchored at each end. However, defendant’s project manager had approved the drawings submitted by plaintiff which showed rawl drives spaced at two-foot intervals, and, therefore, defendant’s chief inspector was without authority to demand more of plaintiff. However, he did demand more, and plaintiff acceded to the demand without protesting to the contracting officer. On account of its failure to protest, we think plaintiff is barred from recovery.
Paragraph 2 of section 10 of the specifications, under the heading, “Interpretations, Protests”, provides “no complaint on the part of the contractor that work demanded of him is outside the requirements of the contract documents * * * shall be considered or entertained unless a protest is submitted in writing to the contracting officer within ten days after receipt of demands for such work * * * stating clearly the basis of the contractor’s objections. Unless the contractor files such protest as above provided, he will be deemed to have accepted, and shall be conclusively bound by, such demand, record, or ruling.”
Both this court and the Supreme Court have heretofore held that protest is necessary even though the action of the inspector is arbitrary and unreasonable. It is necessary even in such case in order that the inspector’s superior may countermand any such arbitrary action on his part, and thus save' defendant from liability for the making of a demand beyond that justified by the contract. United States v. Blair, 321 U. S. 730, 734-737; Silas Mason Co. v. United States, 105 C. Cls. 27, 53-54.
5. The specifications for plastering required that the brown coats should be rodded. This means that they should be smoothed *up with a straight edge extending from the floor to the ceiling. Plaintiff did not do this in a number of different instances. The specifications also required that the finished work should be free from depressions and bulges, etc., and that the surfaces “shall be true planes and of uniform texture; lines and arrises shall be straight and plumb or level *225 and true to grounds and guide lines.” Defendant’s inspectors at the beginning of the job used a straight edge on the ceilings and walls to ascertain whether or not there were bulges or depressions, and where bulges and depressions were so found, the contractor was required to remedy them. It was extremely difficult to prevent bulges and depressions since the walls were only two inches thick and pipes and wiring ran within them.
Plaintiff’s subcontractor protested vigorously against the rigid inspection being made of the walls. Representatives of the Inspection Division of the Housing Authority in Washington were sent to the job and ordered the inspectors to discontinue the use of the straight edge and to accept walls where depressions and bulges were not visible to the naked eye. Thereafter, the plastering subcontractor was permitted to humor the walls to some extent in order to take care of the bulges and depressions, caused, among other things, by the pipes within the walls. After these instructions were given, plaintiff made no further written protest against the requirements of the inspectors. For this reason and for the additional reason, as well, that plaintiff failed to take any appeal to the head of the department from the adverse ruling of the contracting officer on its claim, plaintiff is not entitled to recover on this item.
6. We have carefully examined plaintiff’s other claims, the facts of which are set out in the findings. We find no merit in any of them.
Plaintiff made no protest against most of the requirements of the inspectors, and in no case did it take an appeal to the head of the department from the adverse ruling of the contracting officer.
Most of plaintiff’s claims were first made in its letter of February 14, 1938. In reply to this letter the contracting officer wrote plaintiff that it would be necessary for it to submit all facts and substantiating data in support thereof. In reply the plaintiff on March 17, 1938, requested a hearing “so that a proper basis may be laid for the production of such proof as is necessary or requisite.” The plaintiff was advised that there was no objection to granting a hearing on all the claims, except those which had been ruled upon by him *226 or which had been appealed to the head of the department.
On March 31,1938, plaintiff made a request that the head of the department grant it a hearing. The head of the department stated that he would designate his advisor to sit in with the contracting officer on the hearing to be conducted by him. Mr. Lane, the advisor to the head of the department, sat in for a brief time on one of these hearings, but subsequent proceedings were conducted by the contracting officer. On August 9, 1938, plaintiff submitted a memorandum in support of its claims. On various dates thereafter, on December 9, 1938, January 6, 1939, February 27, 1939, and April 8, 1939, the contracting officer ruled on plaintiff’s claims. After these rulings plaintiff took no appeal to the head of the department. This was required under article 15 of the contract. United States v. Blair, supra.
For the reasons set forth above, plaintiff is not entitled to . recover. Its petition will be dismissed. It is so ordered.
Madden, Judge; LittletON, Judge; and Jones, Chief Justice, concur.