## WINTERS et al. v. UNITED STATES.
### No. 47719.

United States Court of Claims.
July 11, 1949.

LITTLETON, J., dissenting.

Before JONES, Chief Judge and MADDEN, HOWELL, WHITAKER, and LITTLETON, Judges.

Malcolm A. MacIntyre, New York City (Peter A. Campbell, New York City, on the brief), for plaintiffs.

Thomas O. Fleming, of Washington, D. C., H. G. Morison, Asst. Atty. Gen. (Edgar T. Fell, of Washington, D. C., on the brief), for defendant.

MADDEN, Judge.

The plaintiffs sue for $17,893.34, which is the difference between the contract price and the amount actually paid them under a contract which they performed for the Government. The contract was for the clearing of some 400 acres of land at Homestead, Florida, for the Civil Aeronautics Division, Department of Commerce. It was dated April 11, 1941, and contained a unit price of $97.50 per acre for the work. The work was performed, but as we have said, a part of the contract price was not paid to the plaintiffs, because, the Government claims, the plaintiffs were liable to the Government in damages for the nonperformance of another contract, and the amount withheld was the amount of those damages.

On February 8, 1941, the Government had issued invitations for bids on the same work involved in the later contract here in suit. The plaintiffs were the low bidders, their bid being $48.89 per acre. The next lowest bid was $119.00 per acre and other bids ranged up to $271.50 per acre. The Government's estimate of the probable cost of the work, made in advance of the receipt of bids, was $75.44 per acre. The bids were opened on February 28, and on March 7 the Government sent the plaintiffs a telegram accepting their bid, and on March 8 a letter confirming the telegram and containing copies of the contract, and of performance and payment bonds for execution by the plaintiff and by a surety. The plaintiff's bid had been accompanied by a bid bond executed by a surety, in the amount of $1,800, the condition of which was that if the plaintiffs did not withdraw their bid and if they executed a contract, if one should be tendered them, with bonds for its faithful performance, or if they failed to do so, they paid the Government the difference between what it cost the Government to get the work done, and the amount of the bid, the obligation should become void, otherwise it was to remain in effect.

The plaintiffs, after diligent efforts, were unable to get a surety to execute the necessary bonds, because investigation by the first surety approached convinced it that the plaintiffs could not perform the contract for their bid price. On April 4, 1941, the Government wrote the plaintiffs terminating their right to proceed with the contract because of their failure to furnish the requisite bonds.

In the meantime, on March 27, anticipating that the plaintiffs would probably be unable to secure the necessary bonds, the Government had readvertised the same project, inviting bids, and advising the plaintiffs that if they could secure the requisite bonds before April 1, the new invitation would be withdrawn.

The plaintiffs bid again in response to the new invitation. This time they bid $97.50 per acre, and again they were the low bidder. The Government on April 14, 1941, wrote the plaintiffs accepting their bid, enclosing the formal contracts and bonds for signature and stating that this acceptance did not relieve the plaintiffs or their surety of any liability in connection with the failure to furnish proper bonds in connection with their former bid for the same work. The plaintiffs obtained the necessary surety, executed the contracts, and returned them. By a letter dated April 28, the Government sent a signed copy of the contract to the plaintiffs and notified them to proceed. The contract provided that it should be completed within 60 days after the receipt of notice to proceed. It was completed, but as we have said, a part of the contract price was withheld by the Government and set off against the plaintiffs' alleged liability to the Government for its failure

to secure the requisite bonds pursuant to its former bid, which failure, the Government says, was a breach of contract.

The plaintiffs urge, in the alternative, three reasons why the Government should not be permitted to keep the money that it deducted from the contract price. We consider the plaintiffs' contention that, assuming that a contract binding upon them resulted from the first set of events, all rights and liabilities thereunder were superseded and waived when the parties entered into the second contract covering the same subject matter, but for a different price and with a guaranty of performance by a surety.

The Government urges that it did not intend to waive its rights under the earlier contract, and that, even if it had intended to waive them, its intended waiver would not have been binding because of a lack of consideration.

The question is hard, and, in some respects, unique. The weight of authority is that when an owner later promises a building contractor more than the originally agreed price, in order to get him to proceed with and complete a contract on which he is losing money, the owner is not bound by his promise. There is a respectable minority which takes the opposite view. The cases are collected in 25 A.L.R. 1450 and 138 A.L.R. 136. The majority view has been influenced by the fact that in many cases the building contractor's refusal to perform his contract has amounted to economic coercion of the owner to promise an additional payment. In the instant case, there was no such element. The plaintiffs were, so far as appears, ready and willing to perform according to their first bid, but were not permitted to do so by the Government, which had the right to insist that they furnish the agreed bonds before they undertook the work.

The parties to an unperformed contract may rescind it, no matter what advantages one of them may give up in the rescission. Here there is no clear showing of an intention to rescind, at the time that the Government denied the plaintiffs the privilege of performing. It readvertised the

work, and may have intended to attempt to hold the plaintiffs responsible for any increased cost resulting from having it performed by someone else. But when it received a new offer from the plaintiffs, and, in the most formal way, entered into a new contract with the plaintiffs, it created a situation that, at least on its face, was impossible, that is, that two separate contracts should exist concurrently, between the same persons, for the same work, one of which contracts fixed a price twice as high as the other. As the Government has administered the second contract, it was, in effect, a mere repetition of the first, since it entitled the plaintiffs not to the $97.50 per acre stated in it, but to that sum less the difference between that sum and $48.89, the amount of the first bid. So that, again, the plaintiffs had a contract for $48.89 per acre. This time, however, the Government had the advantage of the guaranty of the plaintiffs' performance by a surety.

The Government's caveat, contained in its letter of April 14, 1941, accepting the plaintiffs' second bid, requires our consideration. It said:

You are further notified that this acceptance does not relieve you or your surety of any liability in connection with your failure to furnish acceptable performance and payment bonds and execute contract papers in accordance with your previous bid in the amount of $17,996.41 under Invitation No. 436–41–228 covering the same work.

The liability of the plaintiffs and their surety on the bid bond on the previous bid was $1,800.00. It was, to be sure, a condition of the bond that

In the event of * * * the failure to enter into such contract and give such bond (the performance bond) within the time specified, if the principal shall pay the Government the difference between the amount specified in said bid and the amount for which the Government may procure the required work and/or supplies, if the latter amount be in excess of the former * * *.,

the bond should be unenforceable, otherwise it should be in full force and effect.

The Government argues, in effect, that although the plaintiffs were required to furnish this bond, as an express evidence of liability only in the amount of $1,800 for their breach in not completing the execution of the formal contract, they at the same time, and as a result of the same events, became liable, without limit, for all the damages resulting from the Government's having the work done outside the contract and at a higher cost. It would be extraordinary for parties to contract for a liability limited to $1,800 in the event of the occurrence of the exact events which did occur, and at the same time contract for an unlimited liability for the very same events. If the unlimited liability was contracted for, it must have rested either upon general principles of the law of contracts, or upon some other express provision of the contract papers. As to general principles of contracts, we have no doubt that if an owner asked for bids for work and required a bid bond composed by himself and containing the language which this one contained, he would be regarded as being content, at the preliminary stage of the bidding and the execution of the formal contracts, with limited liability stated in the bond. If he meant to have more liability than this, he could easily have said so.

We look elsewhere in the contract for evidence of the asserted additional liability. Article 9 of the contract which was proffered to the plaintiffs pursuant to their first bid provided:

If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby.

We think that Article 9 is not applicable to the plaintiffs' situation. They did not refuse to prosecute the work. They can hardly be said to have "failed" to prosecute it, since the Government itself, the other contracting party, refused to let them proceed with the work because they failed, not to prosecute the work, but to comply with a condition precedent, without which compliance the Government was unwilling to let them prosecute the work. If Article 9 was intended by anyone to apply to this situation, that intent is expressed so ambiguously that it would be a violation of all rules of construction to so read it for the benefit of the Government, which composed and wrote the ambiguous language. And it would be particularly improper, we think, to make this ambiguous language apply to a situation that is already expressly covered by the other language, also drafted by the Government, of the bid bond. It would be entirely reasonable for the Government, or any owner, to be content with a limited liability in the preliminary stages of contract making, sufficient to insure against frivolous bidding, but not large enough to frighten away possible bidders, who, not having large resources of their own, could not be sure of obtaining a surety if their bids should be accepted.

The correctness of our construction of the contract provisions is supported by the fact that the plaintiffs here were able to secure a surety for the contract based upon their second bid. As the Government has treated it, that contract, in connection with the plaintiffs' continued liability on their first contract, involved the plaintiffs in the same unprofitable transaction from which sureties had shied away before. The fact that a surety was willing to guarantee performance by the plaintiffs of their second contract is evidence that it must have construed the contract provisions as we have construed them.

We have concluded, then, that the contract papers do not show an intention of the parties that two contracts for the same work, but for different prices, should co-exist. But if we assume that the Government did so intend, and by its letter

of April 14, 1941, made the plaintiffs aware of that intention, we have it on the highest authority that only the second contract would be effective. In the case of United States ex rel. International Contracting Company v. Lamont, 155 U.S. 303, 15 S.Ct. 97, 39 L.Ed. 160, the Government had, it was assumed, made a valid contract with International to do dredging work at 19.7 cents per cubic yard. The Government refused to permit performance and readvertised the same physical work, but leaving out a provision about the eight-hour law and setting different dates for its commencement and completion. International bid again, 13.7 cents per cubic yard, having in the meantime commenced a mandamus suit against the proper official of the Government to compel him to execute the first contract. By this suit, and by other communications, International kept the Government aware that it did not intend to waive its rights under its first contract. The Government awarded International contract pursuant to its second bid. The work was performed and the lower price paid. The Court held that International's mandamus suit must fail because, by making the second contract, it had lost its rights under the first. The Court said, 155 U.S. at page 309, 15 S.Ct. at page 99:

"Nor does the fact that in making his second contract the relator protested that he had rights under the first better his position. If he had any such rights, and desired to maintain them, he should have abstained from putting himself in a position where he voluntarily took advantage of the second opportunity to secure the work. A party cannot avoid the legal consequences of his acts by protesting, at the time he does them, that he does not intend to subject himself to such consequences."

In the instant case the times of commencement and completion of the contract, which were never definitely set in the first contract, being dependent upon the giving of a notice to proceed, were, no doubt, different in the second contract from what they would have been in the first. If, then, one were looking for changes, however trivial, to constitute a consideration for a rescission and novation, one could find them in the instant case as well as in the Lamont case. But the Supreme Court did not rest its decision upon the fact of those changes, though it noticed them, nor do we rest our decision upon that ground. We regard the Lamont case as holding that it is a legal impossibility for the Government and a contractor to have at the same time two contracts for the same work, at different prices. If that is the law, when it works to the advantage of the Government, it is the law when it works to the advantage of the citizen.

We conclude that the plaintiffs are entitled to recover $16,093.34, that being the unpaid balance of the contract price under the second contract less the $1,800 for which the plaintiffs became liable upon the nonfulfillment of the condition in their bid bond given with their first bid. The defendant's counterclaim is dismissed.

It is so ordered.

HOWELL and WHITAKER, Judges, and JONES, Chief Judge, concur.

LITTLETON, Judge, dissents.