MaddeN, Judge,
delivered the opinion of the court.
This case is before us pursuant to a Special Act of Congress, approved July 3, 1948, Private Law 457 — 80th Congress, Chapter 831 — 2d Session. The text of the Act is as f ollows:
Be it enaeted by the Senate and House of Representatives of the United States of America in Congress assembled, That jurisdiction is hereby conferred upon the Court of Claims of the United States to hear and determine on the merits and to render, in accordance therewith, judgment upon the joint claims of Silas Mason Company, Incorporated; Walsh Construction Company; and Atkinson-Kier Company against the United States which are embodied in the petition of the said companies filed in the Court of Claims May 1, 1939, as amended February 14, 1940, and therein docketed as number 44,659, excepting from such jurisdiction, however, the claims set out as causes of actions numbered 22, 24, 25, 26, 27, 30, and 31 in the said petition and excepting therefrom that part of the claim set out as cause of action numbered 14 in the said petition for which judgment was rendered by the Court in number 44,659 on October 1, 1945, in the amount of $1,099.80. The Court of Claims is directed to hear, determine, and render judgment upon the said claims notwithstanding any prior determination, any statute of limitation, or any abandonment of, nonconformance with, or deviation from the protest and appeal provisions and procedure of the said contract, including but without limitation to article 15 of the contract and paragraph 14 of specifications numbered 570 involved • in such claims, and without regard to any provisions of the said contract or specifications purporting to confer fi *141 nality upon the decisions of questions arising under the contract by any officer of the United States.
Seo. 2. Adjudication of the said claims by the Court of Claims is directed to be made without reference to the decision by the Court in the case of Silas Mason Company, Incorporated, Walsh Construction Company, Atkinson-Kier Company against the United States on October 1, 1945, numbered 44,659; but the Court shall consider as the evidence in such suit any and all evidence heretofore taken by the parties in the said case of Silas Mason Company, Incorporated, Walsh Construction Company, Atkinson-Kier Company against the United States; and the Court may use as a basis for its findings of fact the report of its commissioner, Ewart W. Hobbs, filed January 11, 1944, upon such evidence subject to the exceptions thereto filed by the petitioners and by the defendant United States both on May 1, 1944.
Sec. 3. Any suit upon such claims brought under the provisions of this Act shall be instituted within six months from the date of enactment of this Act. Proceedings for the determination of such claims, and appeals from, and payment of, any judgment thereon shall be in the same manner as in the case of claims over which such Court has jurisdiction under Section 145 of the Judicial Code, as amended.
The first two plaintiffs being corporations and the third a partnership, they as joint venturers entered into a contract with the United States on July 16,1934, for the construction of the first development, consisting of a low dam and appurtenant works, of the Grand Coulee Dam and Power Plant on the Columbia River in the State of Washington. The Bureau of Reclamation in the Department of the Interior was in charge of the project for the Government. The project was a part of the public works program under Title II of the National Industrial Recovery Act, 48 Stat. 201. The plaintiffs commenced performance under their contract October 4,1934.
On June 5,1935, the Government’s contracting officer issued Order for Changes No. 1, abandoning the plan for the construction of a low dam and ordering the plaintiffs to construct the lower part of a high dam. This change was made because funds were in sight for the completion of the whole project to its final stage earlier than had been hoped when the contract for the low dam was let. The structure comprised in *142 the change order was larger than the low dam and of different design and required the use of different methods of construction. Payments for the work were to be made at unit prices. The estimated cost of the low dam project was some $29,000,000, and that estimate was increased to some $40,000,000 by the change order. The plaintiffs accepted an Adjustment of Compensation issued by the contracting officer.
The work was, on the whole, performed efficiently. It was completed and accepted by the Government on March 21,1938, one year and twelve days prior to the completion date set in the contract. It is not surprising that in a project of such magnitude, carried on over several years, there were disagreements between the representatives of the parties as to their rights and duties, and as to the proper interpretation of the provisions of the contract and its voluminous specifications. The plaintiffs submitted a number of claims, which being adversely decided by the contracting officer, were appealed to the Secretary of the Interior. Before that official had made any decision upon the appeals, the plaintiffs filed a suit in this court upon their claims. In that case, Silas Mason Co., et al. v. United States, 105 C. Cls. 27, as to all of their claims except one and a part of another, the plaintiffs had, without justification, failed to pursue to the end the administrative relief provided for in the contract, and could not, therefore, recover. The court made no decision as to the merits of those claims. Upon the claims not so foreclosed, the plaintiffs were awarded a judgment of $126,219.80.
Thereafter Congress, by the Special Act which we have quoted, relieved the plaintiffs of the disability to which we had found they were subject, and they have brought the instant suit. It includes most of the claims not decided on their merits in the former suit. Those not included have been abandoned. In their petition in the instant case the plaintiffs have retained the same numbering of their causes of action which they used in the former case. We have used that numbering in our findings and opinion. This accounts for the fact that some numbers are missing in the sequence.
In our findings of fact, and in the exceptions and briefs of the parties, the several claims are dealt with under the numbers given them in the plaintiffs’ petition. We will so deal with them in this opinion.
*143 First Cause oe Action
alleged excessive requirements in concrete clean-up
Our Findings 16 to 33 relate to this cause of action. The concrete that went into the dam was poured in blocks five feet deep, most of them 50 feet square. Since the part of the dam built by the plaintiffs was about 150 feet high, it required many successive pourings of these five-foot so-called “lifts.” The succeeding lift could not be poured upon any lift already poured until the concrete had set, and the specifications fixed a minimum period of 72 hours between such pours. If a good bond was not obtained between the successive lifts, there would be elements of weakness in the dam. There were some 19,000 of these block surfaces, on which concrete was later poured.
Specifications No. 570 provided that the surface of each lift should be prepared by the application of jets of air and water at high velocity at the proper time during the setting period. The parties call this process “cutting.” Before the concrete had set hard, the cutting would remove the surface coating which had formed upon the concrete, wash away any loose or defective concrete and any of the whitish soft substance which the water in concrete tends to bring to its surface. Along with these undesirable materials the good concrete on the surface would also be washed away. If it was cut too soon, much concrete would be washed away and wasted. If it was cut too late, it would be too hard for the cutting to be effective, and weak materials might be left adhering to the surface. After the cutting, if it was effective, a surface free of weak materials, and roughened so that it would make a strong bond with the next pour, would remain. If that surface remained in that condition until the next pour was placed upon it, it would be just right.
The specifications required, as we have said, a minimum period of 72 hours between the pouring of successive lifts. In some cases this period was shortened, with the consent of the Government officials, to accommodate the plaintiffs. But in most cases the intervening period was much longer than the minimum. In the meantime, it was necessary to build forms for adjoining blocks, to cut and wash adjoining and *144 higher blocks, to clear form lumber and debris from other blocks in preparation for pouring them. A surface properly cut would frequently, after it was set, become cluttered with sawdust, concrete cuttings considerably hardened, lumber and other debris. The specifications required that surface concrete be kept continuously moist by spraying until the next lift was poured upon it. The constant wetting added to the muss on the surface of the blocks. A final clean-up was, therefore, necessary, before a new lift of concrete could be poured. This cause of action has to do with the final clean-up. The plaintiffs say that the Government inspectors, in addition to requiring them to clean off these miscellaneous materials which had accumulated since the cutting, also required them to remove all of the surface of the lift upon which calcium carbonate had appeared. Certain chemical elements in the concrete, mostly ordinary lime, mixed with the water in the concrete and formed calcium hydroxide. This calcium hydroxide came to the surface of the concrete and was there, by contact with the carbon dioxide of the air, converted into calcium carbonate. As it developed upon the surface of concrete, in some places it was dense and hard and substantially as strong as concrete. In other places it was, in varying degrees, loose and flaky, and much weaker than concrete.
This cause of action involves questions as to the facts of what the Government’s inspectors required of the plaintiffs, and a question as to the proper interpretation of the contract. The plaintiffs claim that they were required to remove all the calcium carbonate that formed on the surface of the concrete. We have found that they were required to remove only that which was, in some degree, loose and flaky and not firmly adherent to the concrete. The oral testimony to that effect is strongly supported by the two written admonitions from the plaintiffs’ superintendent to their clean-up foreman, quoted in Finding 25, which show that the superintendent had observed that the clean-up men were doing more wire brushing than the Government’s inspectors required. This could hardly have been so, if, as the plaintiffs contend, the inspectors were requiring wire brushing of all the surface where, by its pearl gray color, calcium carbonate was visible. *145 Calcium carbonate to some degree forms on the surface of all concrete.
The Government contends that the kind of calcium carbonate which it required to be brushed or sand-blasted from the surface of the concrete in the final clean-up operation, would, if not removed, have introduced an element of weakness in the bond between the concrete surface and the new pour. The plaintiffs do not deny this. They say it is immaterial. The say that the contract did not require them to remove the calcium carbonate, and the consequences of its nonremoval, if it had not been removed, were not their responsibility. The relevant portion of the contract, paragraph 90 of Specifications 570, said:
90. Placing — * * * Concrete surfaces such as the horizontal construction joints of the dam and permanent cofferdam, upon or against which concrete is to be placed and to which new concrete is to adhere, shall be prepared to receive the succeeding lift by having all laitance and loose or defective surface concrete removed by means of jets of air and water applied at high velocity and at the proper time during the setting period. If the clean-up is not performed at the proper stage in the hardening process and in such a manner as to render the surface suitable for bonding with new concrete, as determined by the contracting officer, the defective and undesirable concrete shall be removed by wet sand blasting and, where necessary, by chipping, as directed by the contracting officer, to such depth as is required to produce a satisfactory surface to which new concrete may be bonded. The surface of each lift shall be washed immediately prior to the placing of the succeeding lift of concrete, to remove all foreign material which may have accumulated since the first clean-up operation: Provided, That where foreign material cannot be removed by washing, wet sand blasting will be required. * * *
The plaintiffs say that they performed the cutting operation while the concrete was green, as required by the specifications, and all that they had to do thereafter was to make the final clean-up for the new pour by the removal of whatever might have, in the meantime, accumulated on the surface from the outside. They stress the words “foreign material” in the quoted specification, and insist that the cal *146 cium carbonate, being made up of materials from within the concrete carried to the surface by the water in the concrete, and there mixed only with the carbon dioxide of the air, was not a “foreign” material within the meaning of the specifications.
The Government says that the dam was being built for the ages; that the depth of the water impounded by it would exert an enormous lifting and lateral pressure upon it; that the lake to be formed by it was to be 150 miles long; and that the failure of the dam would cause incalculable loss of life and property. It says that for these reasons the contract should be interpreted as requiring the building of a dam as strong as it would be practically possible to build it. The plaintiffs reply, in effect “It is not so nominated in the bond.” We must decide whether it was so “nominated.”
On a merely literal basis, the plaintiffs’ argument that the calcium carbonate was not a “foreign material” may have some validity. But the quoted specification, as a whole, read in the light of the circumstances in which the language was used, refutes the argument. It called for the cutting, while the concrete was green, to roughen the surface and remove defective concrete. The other provisions of the contract then called for a waiting period, during which the concrete would become hard. A minimum of 72 hours of waiting, sometimes reduced to 48 by the Government’s waiver, was provided. Beyond this minimum, the plaintiffs could make the next pour when they pleased. Until the pour, they were required to keep the surface wet by sprinkling. Until the pour, as long as the concrete continued to have interior moisture, which was for an indefinite period, calcium carbonate would continue to form on the surface, and would stop forming only when the air was shut off from it by its being covered by a new pour. We do not think that the parties intended that the determination of whether the dam should have much or little of this element of weakness in it should be left to the plaintiffs’ option as to when they would pour the next lift. We think that the specification which we have quoted required that the final clean-up remove any substance which had, by that time, accumulated on the surface of the concrete and which would weaken the *? bond between the old concrete and the new. We think the loose and flaky calcium carbonate was a “foreign material” in that it was not concrete and would not serve the purpose of concrete in the dam.
In the concrete clean-up the plaintiffs were not required to do more than was required of them by the contract. They cannot, therefore, recover upon this cause of action.
Second Cause or Action
THE REFUSAL OF THE CONTRACTING OFFICER TO PERMIT THE STRIPPING OF THE GLACIAL TILL FROM THE GRAVEL DEPOSITS
Our Findings 34-43 relate to this cause of action. The plaintiffs complain because the contracting officer required them to process and use a large amount of material beneath the top soil and above the loose sand and gravel in the gravel deposits. This material, called glacial till, was so compacted that the process of breaking it up into its components, for use as aggregates in the making of cement, was more expensive than the processing of an equivalent amount of loose sand and gravel. The plaintiffs seek to recover this extra expense, and also the profits which, they assert, they lost because they were not allowed to strip and waste the glacial till at the contract price for that operation.
The contract provided that the plaintiffs should be paid 30 cents a yard for stripping and wasting the overburden from the gravel deposits. As to the excavation, transportation and processing of the sand and gravel itself, no separate compensation was provided, the compensation for this work being included in the unit price for making and placing the concrete. As we shall see in our discussion of the Third Cause of Action, the deposit of loose sand and gravel which underlay the glacial till contained a much larger percentage of sand than the percentage which could be used in the concrete, and this excess of sand had to be excavated and wasted in order to obtain the requisite amount of gravel. The glacial till, on the other hand, contained a much better percentage of gravel. The expense to the plaintiffs of excavating and wasting the more than 2,000,000 additional cubic yards of sand which they would have had to excavate *148 and waste if they had not used the glacial till would have been greater than the extra expense to which they were put by processing the glacial till.
We now consider the plaintiffs’ claim for profits lost because they were not permitted to strip and waste the glacial till and get paid for doing it. The contract provided that they were to receive 80 cents per cubic yard for stripping and wasting the overburden from the gravel deposits. The plaintiffs had subcontracted the stripping to the Eowland Construction Company for 15 cents per yard. The number of cubic yards of glacial till used by the plaintiffs was 2,272,000. They claim, therefore, that they would have made a large profit if the glacial till had been stripped and wasted.
Paragraph 34 of Specifications 570 said, among other things:
The contractor shall carefully strip the site of the deposits or so much thereof as may be required, of topsoil, vegetation, roots, brush, sod, loam, unsuitable sand and gravel, and other objectionable matter.
The plaintiffs contend that the glacial till was “objectionable matter”, and should, therefore, have been stripped. In the circumstances, it was not objectionable matter. On the contrary, it was desirable matter, in view of its high gravel content and the low gravel content of the material that underlay it and would have had to be used in its place if it had been stripped and wasted. There was no possible reason for wasting it, except that of enabling the plaintiffs to make a profit from wasting it. The plaintiffs cannot recover upon this cause of action.
THIRD Cause oe Action
THE DISPUTE CONCERNING THE PERCENTAGE OE SAND PERMITTED TO BE USED IN THE CONCRETE MIX
Our Findings 44-56 relate to this cause of action. The Brett deposits from which aggregates for the concrete were to be obtained contained 48 percent of gravel and 52 percent of sand. The concrete mix, made as directed by the contracting officer, consisted of 73 percent of gravel and 27 percent of sand. It was, therefore, necessary to discard large *149 quantities of sand, and to excavate large quantities of the mixed deposit in order to obtain the directed percentage of gravel. The plaintiffs contend that the contracting officer should have designed the concrete mix to use only 61 percent of gravel and 39 percent of sand, thereby saving the plaintiffs a large amount of excavating and processing.
In this cause of action the plaintiffs rely particularly upon a sentence in paragraph 81 of Specifications 570, which says:
The individual mixes will be based upon securing concrete having suitable workability, density, impermeability, and required strengths, without the use of an excessive amount of cement, and using, insofar as practicable, the entire yield of suitable materials from the natural deposits from which the concrete aggregates are obtained.
The paragraph, as a whole, relates to the design of the mix and the production of the concrete. The paragraph is long and goes into great detail. It is quoted substantially in full in our Finding 46. In another sentence it says:
In general, the proportions shall be determined by the contracting officer to produce durable concrete of maximum practical economy to the Government and having strength properties commensurate with the time and degree of loading, due account being taken of stress conditions, nature of exposure, type of cement, and other considerations.
The plaintiffs urge that the contracting officer’s design of the concrete mix produced a concrete that was stronger than was required by the contract. The specifications said that the concrete should have a minimum compressivé strength at full loading of 2,800 pounds per square inch. This minimum, of course, was not intended to set the standard. It seems to us that, in a project such as this,, with the large expenditure of money involved, and the harm that would result if the dam should fail, the parties must, have intended to use the strongest concrete that was reasonably obtainable. We think that the margin of safety insisted upon by the Government, beyond the specified minimum strength, was not unreasonable. The evidence shows-that substantially the same strength could have been ob *150 tained, using 39 percent of sand, if the cement content of the concrete had been increased by a total of 900,000 barrels. The cement was furnished by the Government without cost to the contractor. The additional cement would have cost the Government $1,800,000. This additional expenditure by the Government would have saved the plaintiffs some $227,-000 in the excavation of excess sand which had to be wasted. We think that though, in the interpretation of a contract, consideration must be given to the interests of all parties to it, this rule did not require that the Government make so large an additional expenditure in order to save the plaintiffs so disproportionately small an expenditure. In the circumstances, we think that the mix designed by the contracting officer used “insofar as practicable, the entire yield of suitable materials from the natural deposits from which the concrete aggregates (were) obtained.”
The plaintiffs cannot recover upon this cause of action.
Fourth Cause of Action
THE CLAIM THAT SUBSURFACE AND LATENT CONDITIONS MATERIALLY DIFFERING FROM THOSE ON THE DRAWINGS OF INDICATED IN THE SPECIFICATIONS WERE ENCOUNTERED IN THE WEST AND CENTER FOUNDATION AREAS
Our Findings 57-77 relate to this cause of action. The claim is that, in excavating to solid rock upon which to place the concrete of the dam, the plaintiffs encountered two deep gorges which they had not expected to encounter. They show that the excavation and filling with concrete of those gorges was much more costly than such work was upon the relatively level rock surface of the rest of the dam. The question is whether the existence of these two gorges was shown on the drawings or indicated in the specifications. The gorges in question are the Center and West Gorges. The plaintiffs encountered a third gorge, the East Gorge, but they make no claim as to it, conceding that the contract papers put them on notice as to it. We consider, then, the differences in the contract papers in their treatment of the several gorges.
Paragraph 47 of Specifications 570 called the attention of bidders to then recent reports on the geology of the dam *151 site, available at two named locations. Paragraph 48 called attention to available drilling records, and said that drilling was still going on at the time the specifications were issued, and the information disclosed by it would be made available to bidders at the dam site. Construction drawings were attached to the specifications, several of which purported to show an outline of the foundation of the proposed dam. These drawings showed a deep depression at the location where the East Gorge was later uncovered, but only shallow depressions at the locations where the West and Center Gorges were later uncovered. Another drawing showed the locations of the exploratory holes drilled giving a number to each hole, and still other drawings showed accurate logs of what was encountered in the drilling of each hole. The specifications were published on April 16, 1934, and showed only the holes drilled up to that date, or shortly before it. Fourteen additional holes were drilled and their logs were made available at the dam site prior to June 18, 1934, the date of the opening of bids.
In the reports on geology referred to in the specifications, the geologist, in a report of October 10, 1933, explains the causes of the kinds of depressions which he thought would be encountered, and says:
Otherwise the profile of the floor is remarkably flat and smooth, but two depressions are indicated by borings Nos. 1 and 16. * * * No. 10 is similar.
Holes Nos. 1, 16 and 10 were in the East, West and Center Gorge areas respectively. Later in the same report the geologist said:
However, there are at least two depressions in the floor, encountered in Borings 1 and 16, reaching 75 feet or more deeper than the average.
The geologist attached to this report a plan of the borings with three orange-colored bands running through the dam site and said, in an explanation in the report referring to the plan, to be:
intended to indicate the position and orientation of supposed weakness zones in the floor marked by somewhat broken or close-jointed rock.
*152 In the geologist’s report of December 4, 1933, he refers again to holes 1,10 and 16 as being in zones of jointed rock. He says that the field evidence and the borings indicate that there are at least three such zones. Again in his report of March 3,1934 he refers to depressions discovered in the floor by three of the original borings, and names holes 1, 10 and 16 as probably indicating such depressions.
The Government made fourteen additional borings between the time of the publication of the specifications and day of the opening of bids. A glass model made to scale showing these borings was on exhibit at the dam site for the information of bidders.
An estimate made by one of the plaintiffs’ engineers before the bidding mentions two depressions in the granite floor which reached about 75 feet deeper than the average. In view of this repeated disclosure of the probability of what, upon excavation, turned out to be the fact of the existence of the three gorges, we do not think that the plaintiffs could have been reasonably misled by the relatively insignificant fact that the construction drawings, not directed at all to the geology of the site, showed a line of the supposed surface of solid rock which turned out upon excavation to be inaccurate. We think that the specifications disclosed fairly plainly the conditions that were actually encountered.
The plaintiffs cannot recover upon this cause of action.
Fifth Cause op AotioN
THE REFUSAL OP THE CONTRACTING OFFICER TO PERMIT THE CONTRACTORS TO EXCAVATE TO STABLE SLOPES IN THE EAST PORE-BAT OP THE DAM
This cause of action is covered by our Findings 78-99. Briefly, the situation was as follows. In the east forebay area of the dam, the material in the slopes leading down to-the place where the earth and rock were to be excavated and concrete was to be placed proved quite unstable, and repeatedly slid into the excavated area. It was known from the outset by the Government and the plaintiffs that the material was unstable, but they underestimated the degree of instability. The plaintiffs repeatedly requested the contracting-officer to set new slope lines which would permit them to. *153 take, and be paid for taking, material off the top of the slope. If this had been done, it would of course have prevented further slides by relieving the slope of the weight which caused it to slide. The preventive measure would have been wholly at the expense of the Government. The plaintiffs had no suggestion as to how much material should be taken off the top to make the preventive effort effective. We think it was not unreasonable nor in breach of contract for the contracting officer to try the less expensive measures that he did try, to solve the problem, since there was a reasonable prospect that they might solve it.
Although we think that it was not a breach of contract for the contracting officer to refuse to set slope lines which would have prevented the slides, we think that the situation that developed was within the scope of Article 4 of the contract, which says, in effect, that if subsurface or latent conditions are encountered which cause additional expense to the contractor, the Government will make an equitable adjustment to compensate the contractor. We think there should have been an equitable adjustment, and that the items listed in our Finding 99 should have been paid for.
The plaintiffs may recover $32,696.06 on this cause of action.
Sixth Cause of ActtoN
TI-IE DISPUTES CONCERNING THE GOVERNMENT’S ALLEGED INTERFERENCE WITH THE CONTRACTOR’S EXCAVATION WORK IN THE AVEST ABUTMENT AREA, THE RATE OF PAYMENT FOR OTHER WORK IN THAT AREA, AND THE AWARD TO A THIRD PERSON OF STILL OTHER WORK IN THAT AREA
Our Findings 100-115 relate to this cause of action. In the area where the west abutment of the dam was trenched into a promontory of granite, there was, between this promontory and another one lying downstream from it, a ravine about 200 feet wide filled with an alluvial deposit several hundred feet deep, and sloping from the elevation of the river which was 950 feet above sea level up to the top of the mountain at elevation 1545. A great deal of common excavation was done in this ravine, and the plaintiffs claim that they should have been allowed to do it all, and should *154 have been paid the contract price of $1 per cubic yard for doing it. In fact, they were paid this price for excavation only up to elevation 1150. As to this part of the excavation, they claim that they were damaged by interference by the Government with their operations. The part between elevations 1150 and 1275 was done by the plaintiffs, but they were paid only 43 cents per yard for it, pursuant to a proposal made by them and an extra work order issued by the Government. The part between elevations 1275 and 1545 was done by another contractor under a separate contract with the Government, at a price of 24 cents a cubic yard.
Some excavation was done by another contractor in the ravine here in question before the plaintiffs made their original contract for the project on July 16, 1934. A major - slide had occurred. The Government set the slope at 2 to 1, and the plaintiffs began to excavate on October 4, 1934. Cracks appeared in the upper portion of the slide area. If a slide had occurred, it would have delayed the plaintiffs in their work, and would have delayed the completion of a railroad grade and a highway grade which were being constructed across the area. Both the railroad and the highway were important to the plaintiffs in their work. The Government, fearing that a slide would occur, directed the plaintiffs to leave an unexcavated plug at the toe of the slide area until, by excavation above and by other means, the material above had been stabilized. The plaintiffs, by December 13, 1934, had installed a conveyor belt system equipment for the rapid removal of excavated material to the waste dump, and this equipment could not be used to capacity because of the restriction upon excavation. The restraining line was moved up the ravine as rapidly as it seemed prudent to do so, and was removed on April 3, 1935. The plaintiffs’ costs were increased by the restraint, and they sue for compensation.
We are not clear as to the basis of this claim of the plaintiffs. We do not understand them to assert that it would have been prudent to remove the plug in the ravine before it was removed. There was, apparently, a real risk that its removal would have seriously damaged the plaintiffs. No reason occurs to us for regarding this cautionary measure as a breach of contract by the Government.
*155 Whatever basis there may have been for a claim for compensation for alleged interference by the Government was compromised and settled by the new agreement entered into by the parties after the events above recited had occurred. As we have seen, on June 5, 1935, the project was changed and enlarged by Order for Changes No. 1, and thereafter for several months the adjustment of compensation pursuant to the changes was negotiated by the parties, and the agreed Adjustment of Compensation was accepted and signed by the plaintiffs in December 1935. In the course of the negotiations, the question arose as to whether, under the enlarged contract, common excavation should still carry the former contract price of $1 per cubic yard. That price was very profitable to the plaintiffs, as appears from their contentions in this case, and from the several instances appearing in the record in which they subcontracted such work, or could have done so, for a minor fraction of $1 or in which other contractors did similar work for such a lower price. In the negotiations, the plaintiffs, on August 23, 1935, in urging that the $1 price be retained in the new schedule of compensation, recited the increased costs which they had incurred as a result of the events which we have recited, and said—
We have made no claim for additional compensation on account of these restrictions, but we think it entirely in order that these difficulties be taken into consideration in fixing the price for additional work of the same character.
This statement, at the end of the paragraph of the letter quoted in our Finding 111, in which the difficulties of excavation under the circumstances there recited were encountered, was a representation that, if the $1 rate was continued for future work, no claim would be made for the past difficulties. The rate was continued, and any claim which the plaintiffs might have had was settled.
We consider now the plaintiffs’ claim that they should have been permitted to do the excavating from elevation 1275 to the upper end of the ravine, and should have been paid $1 per cubic yard for doing it. In fact, the work was given to another contractor after bids had been invited, and that contractor did the work for 24 cents per cubic yard. The plain *156 tiffs say that they could have subcontracted the work to that contractor, and thus could have made a profit of 76 cents per cubic yard, or $196,501.35.
We think the plaintiffs’ claim is well founded. The relevant parts of paragraph 56 of Specifications No. 570 read as follows:
Excavation, General. — * * * excavation for foundations of the dam and powerhouse, which shall include all open-cut excavations required for the construction of the dam, powerhouse, and appurtenant construction, will be measured for payment to slopes of 1 to 1 for common excavation * * *: Provided further, That for any required excavation where, in the opinion of the contracting officer, the conditions warrant, the excavation will be measured for payment to the most practicable dimensions and lines as staked out or otherwise established by the contracting officer: Provided further, * * * material in slips and slides extending beyond the established slope lines or below the established grade lines will be measured for payment if, in the opinion of the contracting officer, such slips or slides are beyond the control of the contractor and not preventable by the exercise of reasonable care and diligence: * * *
The Government says that this excavation was not within the 1 to 1 slope named in the specifications, nor within the iy2 to 1 slopes which had been set by the contracting officer at the time the work was given to the outside contractor. But these slopes were meaningless. In fact, the Government had by this time decided that the dam and appurtenances could not be successfully built unless the weight was taken off this unstable ravine by surface excavation all the way to its upper end. That excavation was “required for the construction” of the project, and was covered by the contract. If the plaintiffs had agreed to do the excavation for a price which turned out, in practice, to be ruinously low, they could still have been required to excavate this ravine at the agreed price. The contracting officer cannot, merely by setting slopes which are not those to which the excavation is, in fact, made, eliminate work from the contract because the contract has turned out to be improvident for the Government.
The item of the plaintiffs’ claim relating to the excavation between elevations 1150 and 1275 differs from the item just *157 considered in only one respect, but that difference presents a difficult problem. The work was within the contract, and the plaintiffs had a right to do it and to be paid $1 per yard for doing it. The contracting officer would not permit them to do it under the contract, and requested that they submit a proposal of terms on which they would do it. They submitted a proposal of 43 cents a cubic yard, subject to five specified conditions. The contracting officer thereupon issued Extra Work Order No. 8 directing them to do the work at 43 cents per yard, and in this letter of transmittal to the plaintiffs, said in effect that the Government would not be bound by the conditions attached to the plaintiffs proposal.
The plaintiffs did the work and were paid the 43 cents. They sue for the difference between that and $1, which difference amounts to $198,970.47. They are entitled to recover on this item, unless the proposal which they submitted upon request, and the contracting officer’s direction, prevent recovery.
We have recently had occasion to consider the problem of whether a later contract between a citizen and the Government covering the same subject matter as an earlier one, supersedes the earlier one. William Winters et al. v. The United States, 114 C. Cls. 394, 84 F. Supp. 756, certiorari denied, December 19, 1949, 338 U. S. 903. In that case the parties, if they had an earlier contract binding upon them, were free and at arms length as to whether they would enter into another one or stand on their earlier one. We held that in that situation the later contract superseded the earlier one. In this case the plaintiffs were not thus free. They were, under their contract, obliged to perform extra work orders for any work which the contracting officer might direct. If no price for extra work was agreed upon, they were to receive their costs plus ten percent. The contracting officer insisted that this excavation was outside the contract and requested a proposal. The plaintiffs’ only choice was a choice between a price suggested by them and cost plus ten percent, and either alternative was much less favorable than the contract price to which they were entitled. We think that, having been put in that position by the Government’s improper interpretation of the contract, they did not, *158 by attempting to save what they could, lose their rights under the contract. It would have been completely impracticable, and would perhaps not have been lawful, for them to insist that they would not do the work at all unless they were currently paid $1 per yard, and thus they were under economic coercion to make a proposal for a lower price.
The proposal which they made, with the five conditions attached, was not accepted by the Government. Instead, it repudiated the conditions, and accepted only the price. There was, therefore, no second contract to supersede the first. But, as we have said, we think they would not in the circumstances have been bound by the second contract if one had been made.
The plaintiffs are entitled to recover $895,471.82 on this cause of action.
SevbNth Cause of Action
THE ALLEGED WRONCFTTL ASSESSMENT OF LIQUIDATED DAMAGES FOR GROUT PIPE BECOMING CLOGGED BY REASON OF DESIGN PROVIDED BY THE GOVERNMENT AND FAILURE OF THE CONTRACTING OFFICER TO PAY FOR ALLEGED EXTRA-CONTRACTUAL WORK REQUIRED BY HIM TO PREVENT GROUT PIPES FROM BECOMING CLOGGED
Our Findings 116-136 relate to this cause of action. In the placing of the concrete, a system of pipes was installed through which, after the concrete was fully shrunk and the narrow so-called “contraction joints” between the blocks had opened, a fluid solution of cement and water called grout could be injected to fill the joints and make a monolithic block of the whole dam. Another requirement of the contract was the “C” hole grouting of the rock foundation of the dam, to fill up any crevices or seams in the rock. This was deep grouting, done after the “B” hole grouting treated in the Twentieth Cause of Action had been done, and after at least 25 feet of concrete had been poured on the rock foundation. If the B hole grouting had been perfectly effective, it would have made the upper part of the rock foundation impervious, and the C hole grout, forced into the deep rock, though under great pressure, could not have come up *159 to the surface of the rock, or above that surface into the contraction joints of the concrete. It was, however, anticipated that some of the C hole grout would come up, and the contract called for the insertion of grout stops in the contraction joints, which stops were parallel to and about 18 inches above the surface of the fundation rock. These stops were strips of copper folded in the shape of a Z, so designed as to spring open as the concrete shrank, and keep the joint stopped against grout coming from below. Similar stops were placed at the upstream and downstream ends of the contraction joints which ran at right angles to the axis of the dam, to keep foreign matter from getting into the joints from those directions. The precaution about preventing the C hole grouting from getting into the contraction joints was, principally, because if it did get into them it would get into the system of grout pipes leading into the contraction joints and, when it had hardened, would make the pipes useless and make it impossible to grout the contraction joints when the time came to do that.
Paragraph 74 of Specifications 570, quoted in our findings, says in regard to the grout pipes that “Great care shall also be taken to insure that all parts of the system are maintained free from dirt and other foreign substances”. It further says:
Any pipe that becomes clogged before final acceptance of the work, due to any cause, shall, if practicable, be cleaned or opened up to the satisfaction of the contracting officer. For any pipe which the contractor fails to open up or to replace to meet this test the contractor shall pay to the Government as fixed, agreed, and liquidated damages the sum of two dollars ($2.00) per lineal foot of the total length of pipe which is thereby made ineffective as determined by the contracting officer.
In spite of the precautions taken, C hole grout had a tendency to get into the contraction joints and the grout pipes. Perhaps it passed through cracks, which frequently occur in blocks of concrete. The tendency was not due to any fault or neglect on the part of anyone. In connection with some other work, the plaintiffs had discovered that if water was circulated through the grout pipes when pressure grouting was being done, it would keep the pipes clear by washing *160 out the grout while it was still soluble. Because this operation was effective, the contracting officer required the plaintiffs, whenever they were doing C hole grouting, to circulate water through all grout pipes that were within 100 feet of the C hole. This, of course, caused expense to the plaintiffs, and they say that it was not required by the contract.
Notwithstanding the circulation of water to prevent the clogging of grout pipes, there were five instances in which the pipes were clogged, to a total length of more than 900 feet, and liquidated damages in the amount of $1,857.20 were assessed against the plaintiffs for the clogged pipes.
The plaintiffs seek to recover the liquidated damages and the expense of the circulation of water through the pipes, because the clogging was not due to their fault, and the circulation of water was not called for by the contract. But the plaintiffs had, in the language which we have quoted, unqualifiedly agreed to either keep the pipes open or pay the liquidated damages. The question of fault or lack of it thus became irrelevant. And since it had been learned that the only effective way to keep the pipes open was by the circulation of water, the contracting officer, whose duty was, not to collect liquidated damages, but to get a good dam built, had, we think, the right to insist that the plaintiffs use the only known method of keeping the pipes open. We think the plaintiffs did not have the alternative rights of either keeping the pipes open or paying liquidated damages. They had the duty to keep the pipes open and the Government had the right to insist that they do whatever was necessary and practicable to accomplish that result. Besides, we think the evidence indicates that if the plaintiffs had not washed out the pipes by circulating water through them, so many more of them would have been clogged that the additional liquidated damages would have been greater than the expense of circulating the water. Hence the plaintiffs have not proved that they were damaged by the contracting officer’s requirement.
The plaintiffs cannot recover upon this cause of action.
*161 Eighth Cause of ActioN
REFUSAL OF THE CONTRACTING OFFICER TO FAY FOR LONGITUDINAL CONTRACTION JOINTS CONSTRUCTED IN THE POWERHOUSE AND SPILLWAY BUCKET AREAS OF THE DAM
Our Findings 137-147 cover this cause of action. It has to do with contraction joints and a fuller description of them is found in our discussion under the Ninth Cause of Action. The contract provided that such joints at right angles to the axis of the dam should not be paid for, their cost being included in the agreed price for the concrete. The original contract, in paragraph 73 of Specifications 570, also provided that the Government could, at its option, require the construction of longitudinal, i. e., parallel to the axis of the dam, contraction joints, paying for them 30 cents per square foot. When Order for Changes No. 1 enlarged the plaintiffs’ project it said that longitudinal contraction joints should be constructed under the provisions of paragraph 73, to which we have just referred. Paragraph 9 of the specifications attached to Order for Changes No. 1, is headed “Contraction Joints” and said:
The cost of constructing all contraction joints normal [i. e. perpendicular or transverse] to the axis of the dam shall be included in the price for “Concrete in dam”, as stated in the schedule of this order. The contractor will be paid thirty cents ($0.30) per square foot for constructing longitudinal contraction joints required to be constructed in the concrete of the dam, as provided in paragraph 73 of Specifications No. 570.
Paragraph 97 of Specifications 570 contains a definition of “Concrete in dam” saying in effect that that expression in the schedule of payment per cubic yard for concrete did not include concrete placed in the spillway bucket and powerhouse areas, the areas in question in this cause of action. The Government says that since the concrete placed in those areas was not “Concrete in dam” within the meaning of paragraph 97, the provision in paragraph 9 quoted above, providing for the payment of 30 cents per square foot for longitudinal contraction joints “in the concrete of the dam”, does not apply to the areas, and hence the provision of paragraph 96 of Specifications 570 saying:
*162 Except as otherwise provided, the cost of all labor and materials used in forming contraction joints shall also be included in the unit prices bid [for the placing of concrete].
We think the Government’s interpretation is’ not correct. The definition of “Concrete in dam” in paragraph 97 gave that expression a technical meaning for the purpose there stated, i. e., of fixing the pay for the placing of concrete. If used elsewhere, in quotations, as it was in paragraph 9 quoted above, it would have the same meaning. But the next sentence of the paragraph where the expression, “the concrete of the dam” was used, not in quotations, would indicate that the latter words were used with their natural meaning. There was no reason why the longitudinal contraction joints in the areas here in question should not be paid for, hence the interpretation urged by the Government would draw a distinction for which there was no apparent reason.
There is a question in this cause of action whether the measurement for payment should be the area of the vertical plane of the joints, or the area of the irregular surface of the keys. We think it should be the former, and we give our reasons for that conclusion in our discussion of the Ninth Cause of Action.
The plaintiffs may recover $28,356.78 on this cause of action.
NiNtii Cause oe ActioN
THE CONTROVERSY CONCERNING THE MEANING OE THE PROVISION IN THE SPECIFICATIONS THAT EOR PAY PURPOSES THE MEASUREMENT OE THE LONGITUDINAL CONTRACTION JOINTS SHOULD BE MADE “IN THE PLANE OP THE JOINTS”
Our Findings 148-154 relate to this cause of action. The contract provided that the separately poured blocks of the dam, instead of presenting flat lateral surfaces to the blocks to which they lay adjacent, should be keyed into those adjacent blocks by irregular surfaces. The irregular surface of the block first poured would be made by building a projection or depression in the shape of a triangular prism into the form, which would cause a similarly shaped projection *163 or depression in the concrete when it was poured. Such a projection would be called a key, and such a depression a key way. In the transverse joints the keys stood vertical, and in the longitudinal joints they lay horizontal. The latter are the ones in controversy in this cause of action.
The contract said “the Contractor will be paid 300 per square foot for constructing longitudinal contraction joints” and that measurements should be made “in the plane of the joints.” The plaintiffs seek payment for each square foot of surface of the prism. The Government has paid only for the number of square feet which would have been presented if the surface of the block had been flat and plumb. We think the Government’s interpretation is correct. The general plane of the joints between adjacent blocks of concrete was vertical. The irregularities caused by the forming of the keys and keyways were in a number of different planes. The reference to the “plane of the joints,” in the circumstances must have meant the general plane and not the several different planes.
The plaintiffs cannot recover upon this cause of action.
Tenth Cause op Action
THE REEUSAL OE THE CONTRACTING OEEICER TO PAY EOR CERTAIN ROCK EXCAVATIONS IN THE EAST ABUTMENT AREA AT THE RATE CLAIMED BY THE PLAINTIFFS TO BE PROVIDED IN THE ADJUSTMENT OE COMPENSATION
Our Findings 155-164 relate to this cause of action. As we have seen, the original contract called for the construction of a complete low dam. Before the work had proceeded very far the Government by Order for Changes No. 1 changed the project and the parties contracted for the construction of the lower portion of a high dam. This change meant not only that the structure would be much wider from its upstream face to its downstream face, but that the east powerhouse, which, though always intended as a part of the ultimate project, was not intended to be built as a part of the plaintiffs’ project, should be presently built.
In the discussions with regard to how the additional work should be paid for on the enlarged project, it was agreed *164 that since most items of work were being done at agreed unit prices under the original contract, the same unit prices should apply to the enlarged project. However, the plaintiffs said that their bid of $2 per cubic yard for rock excavation, which had become the contract price, was too low, and the Government agreed that the price for additional rock excavation should be $4. Our problem in this cause of action is to determine just what rock excavation the $4 rate of pay applied to.
On page S of the Adjustment of Compensation, appears this paragraph:
(b) Excavation, rock, for foundation of dam on east abutment outside of the excavation limits of the dam as contemplated under specifications No. 570, and of the power house, at four dollars ($4.00) per cubic yard.
The specifications attached to Order for Changes No. 1, in paragraph 2, read as follows:
Excavation, rock, for foundation of dam on east abutment outside the excavation limits of the low dam and power house. Excavation of rock on the east abutment outside the limits of the low dam and power house, will include all rock excavation outside the limits of the area of the rock excavation which would have been required for the construction of the low dam in accordance with the provisions of specifications No. 570. Measurement of the rock excavation for payment will be between the excavation slopes for the two heights of the dam as determined by the contracting officer. Payment for rock excavation for foundation of dam on east abutment outside the excavation limits for the low dam and power house will be made at the unit price stated therefor in the schedule of the order which price will include all cost of excavation and disposal of excavated materials.
The meaning of the quoted language cannot be obtained from the mere reading of the words. The words must be read in connection with the circumstances in which they were used, and with the construction which was put upon them contemporaneously with their use.
The rock excavation here in question did not lie between the excavation slopes for the two heights of the dam. It lay downstream from the area between the slopes. The question then is whether it would have been required for *165 the construction of the low dam. In fact, what would have been required lay, to a considerable extent, within the discretion of the contracting officer. The contract provided that, in many situations, areas of éxcavation and other features of the work should be as he staked them out, or as drawings to be furnished by him should show them. This was agreeable to the parties since payment was to be made at unit prices for the work done. Because of the fact that the original contract contemplated a project which was intended to be later continued and expanded, the question of just where it would stop, and further work would be left for a later project, was purposely left to the discretion of the contracting officer. We have no doubt that if the order for changes in the plaintiffs’ work had not been made, and the contracting officer had required the plaintiffs to do the rock excavation here in question under their original contract, and at the unit price of $2 per cubic yard provided in that contract, he would have been acting within his agreed powers.
The order for changes and the agreement for a unit price of $4 for additional rock excavation, did not take away the Government’s right to have the excavation that would have been required for the construction of the low dam done at $2 per yard. After the order for changes, the contracting officer could not have added to the area not intended to be excavated for the low dam, merely for the purpose of placing the work within the area of the lower unit price. We have found that this was not the case. The dates when the drawings were prepared, as shown in our findings, and the fact that they were not prepared earlier because the plaintiffs had not excavated the common and uncovered the bedrock, show that the excavation here in question would have been required of the plaintiffs if their contract had not been modified. The fact that the plaintiffs were paid the $4 rate for 138,810 cubic'yards, when the estimate of the yardage in Order for Changes No. 1 was for only 30,000 cubic yards, shows that .the plaintiffs’ expectations as to the amount of $4 yardage given them by the new contract were not disappointed.
The.facts recited in our Finding 162 with reference to the payment by the Government, for' a considerable period, *166 of $4 per cubic yard, on the plaintiffs’ current estimates, for a part of the excavation here in question, and the later subtraction by the Government of $2 per yard from these payments show, apparently, only an error by some person in the Government staff, and is not significant as a contemporaneous construction of the specifications.
The plaintiffs are not entitled to recover on this cause of action.
EleveNth Cause op Action
TI-IE ALLEGED PAILURE OP THE CONTRACTING OFFICER TO DELIVER THE RAILROAD TO THE PLAINTIFFS AS PROVIDED IN THE CONTRACT
Our Findings 165 to 177 relate to this cause of action. The plaintiffs say that, while the work was in progress, the Government required them to construct twelve galleries, shafts, or similar structures in the dam, which had not been provided in the specifications and accompanying drawings. Payment to the plaintiffs under the contract, so far as relevant in this cause of action, was a fixed price per cubic yard of concrete placed. No payment was provided for the construction or placing of forms. The most profitable work, then, was the placing of large cubic yardages of concrete in large blocks, with as few forms as possible. The insertion of a gallery or a shaft in the dam had adverse effects upon the plaintiffs in that it caused additional unpaid labor in constructing and placing forms, and in repairing the surfaces from which forms were removed, and in that it reduced the amount of pay yardage of concrete placed. The plaintiffs say that the Government had no right to so adversely change their position by its changes in the construction of the dam.
The Government points to paragraph 24 of Specifications 570, which we have quoted in Finding 168, which reserves to it the right to change the design of the dam, and provides that for such reasonable changes as, in the opinion of the contracting officer may be necessary or desirable, the contractor shall be entitled to no extra compensation unless the change increases the number of pay units provided in the pay schedule. This provision of the contract seems to be a bar *167 to the plaintiffs’ claim. We can imagine a situation where the changes made might so adversely affect the contractor that it would be inequitable to give full effect to the language upon which the Government relies. Compare our treatment of the Sixteenth Cause of Action. The instant case is not such a case. The plaintiffs point only to those changes which affected them adversely. Other changes were made which affected them favorably by reducing the amount of forming and increasing the pay yardage of concrete placed. Offsetting the favorable changes against the adverse ones, the plaintiffs were paid for placing 30,296.62 yards of concrete more than they would have been paid for if the design had been left unchanged, and were relieved of the expense of building 79,213.08 square feet of forms which they would have had to build without compensation if the design had been left unchanged.
The plaintiffs are not entitled to recover upon this cause of action.
Twelfth Cause oe Action
THE ALLEGED FAILURE OP THE CONTRACTING OEEICER TO DELIVER THE RAILROAD TO THE PLAINTIFPS AS PROVIDED IN THE CONTRACT
This cause of action is covered by our Findings 178-193. The Government agreed, in paragraph 51 of Specifications 570 to construct a railroad from Odair, a station on the Northern Pacific railroad, to the dam site, and turn it over to the plaintiffs. The paragraph said:
It is contemplated that the railroad will be completed and ready for operation by December 1, 1934, but the Government does not guarantee that it will be completed and turned over to the contractor for the dam by that date.
The Government made contracts with other persons for the construction of the railroad. There was some delay in the letting of the contracts, because of an irregularity in the bid of the low bidder. There was a delay in the delivery of ties, which were to be furnished by the Government, because the Government’s supplier failed to perform his contract. In spite of these delays, the contractor who was building the *168 railroad would have had it completed from Odair to Electric City shortly after December 1,1934, except for the fact that the weather got so cold that ballast could not be worked under the ties. Electric City was only two or three miles from the dam site, and the plaintiffs had a storage yard there.
The railroad was completed to Electric City on May 2,1935. Because of several slides between Electric City and the dam site, that short section of the road was not completed until July 17, 1935. The complete railroad was turned over to the plaintiffs on July 24,1935. The plaintiffs incurred additional expense by reason of having to transport their materials by truck from the Northern Pacific station, rather than by railroad.
In view of the language which we have quoted from the contract, there was no absolute duty on the Government to deliver the railroad to the plaintiffs on December 1, 1934. Its duty, rather, was to use reasonable care and consideration for the interests of the plaintiffs, who, as it knew, would be harmed by the late delivery of the railroad. As to the short section of the road between Electric City and the dam site, we do not understand the plaintiffs to claim that the Government was at fault in not getting it completed. As to the section from Odair to Electric City, we think the Government’s failure to cancel the contract with the supplier of ties somewhat earlier than it did was not unreasonable, as it could hardly have been foreseen that a two weeks’ delay in the delivery of the ties would delay the completion of the railroad until spring. In any event, much of the plaintiffs’ damage could, apparently, have been avoided if they had asked for the use of the railroad from Odair to Electric City, which was completed on May 2, 1935, without waiting until July 17, when the remaining short section was completed. The plaintiff cannot recover upon this cause of action.
Thirteenth Cause of Action-
THE CONTROVERSY CONCERNING THE RATE OF PAYMENT FOR CONCRETE IN STEPS ABOVE ELEVATION 949 IN THE POWERHOUSE' AREA
Our Findings 194-200 relate to this cause of action. Under the original contract for the complete low dam, the *169 west side powerhouse was to have been built by the plaintiffs. It would have been physically at some distance from the dam, and the water would have been carried from the dam to the powerhouse through steel tubes. Specifications 570, in the original contract, included a schedule of payment for concrete in which item 24 “Concrete in dam” was priced at $3 per cubic yard, item 30, “Concrete in powerhouse below turbine floor”, at $7, and item 31, “Concrete in powerhouse above turbine floor”, at $10. The reason for the difference in prices was that the “Concrete in dam” was mass concrete, of which millions of yards were to be poured in large blocks, while the concrete in the powerhouse below the turbine floor and that above the turbine floor involved relatively small yardages, requiring much more forming and labor in pouring. That above the turbine floor was to have been placed in the walls and floors of a fairly high building, with all the difficulties attending that operation.
When the change was made from the construction of the complete low dam with the west side powerhouse to the construction of the lower part of a high dam, construction of the powerhouse above the level of the turbine floor was eliminated from the plaintiffs’ project, and left for the contractor who would complete the high dam. The Order for Changes No. 1 said:
Eliminate all powerhouse construction above the level of the turbine floor at elevation 949.
The new specifications, written to accompany the Order for Changes No. 1, contained the following language:
5. Concrete in dam. — The item “Concrete in dam” under this order includes all concrete to be placed in the main structure of the dam; except the concrete in training walls, the trash rack structures, the spillway bucket, and powerhouse foundations, as described in this order. * * *
6. Concrete in powerhouse below elevation 949.0.— The item of the schedule of this order “Concrete in powerhouse below elevation 949.0”, includes all concrete in the foundation of the power plant below elevation 949.0; * * *
Paragraph 5 specified a price of $3 per cubic yard and paragraph 6 a price of $7.
*170 The modified project agreed to by the acceptance of the order for changes, made the dam structure much longer and wider, so that it reached to and into the powerhouse area. The slope of the downstream face of the dam sliced into the upstream side of the powerhouse site. It became necessary, therefore to build that side of the powerhouse up from the slope of the dam, instead of resting it directly upon a rock foundation of its own. For an effective tie-in between the dam and the powerhouse which was to be built upon it, the downstream face of the dam, in the powerhouse areas, was designed with steps, instead of the smooth slope which the rest of the dam had. These steps were inserted, not only below the level, of the turbine floor at elevation 949, up to which level the plaintiffs were to build the powerhouse, but above that level, where the succeeding contractor was to build the superstructure of the powerhouse. The steps were formed and poured monoiithically with the adjacent blocks of the dam.'
The controversy relates to the concrete in the steps so far as it projected outward from the line of the slope of the dam. The Government says it was “Concrete in dam” and hence carried the $3 price. The plaintiffs say that it was “Concrete in powerhouse above turbine floor” and hence carried a $10 price. The difficulty in the plaintiffs’ position is that under the Order for Changes No. 1, all powerhouse construction above the level of the turbine floor had been eliminated, and hence no provision for paying for it at any price had been made. The new definition of “Concrete in dam”, in paragraph 5 quoted above did not list this concrete as an exception, and the specification in paragraph 6 of “Concrete in powerhouse below elevation 949” did not include it, and if it had included it, would have priced it at $7, and not the $10 which the plaintiffs claim.
The difficulty with the Government’s position that the concrete here in question was “Concrete in dam” within the meaning of the contract papers, arises out of paragraph 103-of Specifications 570 which reads in part as follows:
Concrete in powerhouse. — The items of the schedule . “-Concrete -jin; powerhouse below turbine -floor” and “Concrete in powerhouse above turbine floor” include-, all concrete involved in the construction of the power *171 house downstream from a plane representing the downstream face of the section of the high dam, as shown on the drawings. The elevation of the turbine floor shown on the drawings is 949.0.
The concrete in the projecting steps was downstream from the plane mentioned in the quoted specification. It may be that the paragraph just quoted was superseded by the new specifications accompanying the order for changes, but we are not convinced that it was.
The concrete in controversy was not, then, “Concrete in dam” as defined in the contract, and if it was “Concrete in powerhouse above turbine floor” as the plaintiffs assert, it was in a classification that had been expressly eliminated from the modified contract and no price was fixed for it. Since the plaintiffs were directed to form these steps, they should be paid whatever is equitable and fair, if they have not already been so paid. The fact that the original contract called for $10 per cubic yard for concrete in the powerhouse above the turbine floor, is of no significance in arriving at a just price for this work. As we have said, that concrete would have constituted the walls and floors of a high building, with much special forming and small yardages of concrete. This concrete was poured in the same forms and by the same methods as all the rest of the millions of yards in the dam. It contained reinforcing rods, but the plaintiffs were paid a certain price per pound of rods here, as in many other places in the dam, for placing the rods, and for the additional labor of pouring the concrete between the rods.
It might be thought that the $7 per cubic yard which the Government paid for the concrete in the steps below elevation 949 would-be, rather conclusively, an equitable price. The $7 price was paid for all of the concrete placed in the powerhouse below the turbine floor. The concrete in the steps was only a small fraction of all that concrete, and the concrete not in the steps was the part that involved much forming for small yardages.
The concrete most nearly comparable to the concrete her© in question was the concrete in the mass of the dam itself,, which, in reality, though not by- the letter of. the contract,, this concrete,was. The.only fact calling for additional compensation on a quantum mermt basis was that, in some *172 places in the steps, reinforcing rods bad to be left protruding horizontally, for the purpose of tying in the superstructure of the powerhouse, when it would be built by the contractor who completed the dam. The boring of holes in the form lumber for these rods, and the frequent destruction of the forms in removing them, were extra expenses which should be compensated. On the other hand, we suppose that the rectangular forming, and the level finishing of these steps was in some respects easier than the forming and finishing of the slope which the steps replaced. On the whole, we think that an addition of $1 per cubic yard to the contract price of the concrete in the dam would give the plaintiffs fair compensation for the building of the steps.
The plaintiffs are entitled to $5,606.75 on this cause of action.
Fourteenth Cause of Action
CLAIM FOR THE COST OF CIRCULATING WATER THROUGH THE GROUT GROOVES AND REPAIRING CLOGGED GROUT GROOVES
This cause of action is covered by our Findings 201-206. The grout grooves were a part of the system designed for grouting construction joints between adjacent blocks of concrete to fill the spaces left by the shrinkage of the concrete as it dried. The purpose of the grooves was to permit water, air or impurities in the grout to escape when the liquid grout was forced into the narrow space between the blocks. The design of the covers for the grooves was a rather delicate one which, however, seems to have proved quite practical. The plaintiffs, in order to make sure that the grooves did not become clogged with concrete when the blocks adjoining those containing the grooves were poured, forced water through the grooves while the concrete was still green. In spite of this precaution, 113 feet of the approximately 80,-000 feet of grooves became clogged, and the concrete had to be chipped away to clean them out. The plaintiffs sue for the cost of the washing and repairing. They say that the Government designed the grooves and covers, that the plaintiffs took the precautions which the contract required to keep concrete out of them, that they washed the grooves because that was the cheapest way to prevent them from being clogged in *173 spite of the precautions required by the contract, and that the repairs were not made necessary by any fault of theirs.
We think the plaintiffs should recover, for the reasons which they assign. Callahan Construction Co. v. United States, 91 C. Cls. 538, 651. The evidence as to the costs of these operations is completely unsatisfactory. We have concluded that the plaintiffs should recover $400 for the washing and $1,000 for the repairs, a total of $1,400 on this cause of action.
Fifteenth Cause op Action
THE BISPUTE AS TO THE MEASUREMENT POR PAY PURPOSES OP THE COMMON EXCAVATION INSIDE THE COPPERDAMS
Our Findings 207-210 relate to this cause of action. Because it was practically impossible to measure accurately the amount of common excavation which would have to be done inside the cofferdams, the contract provided that payment for this excavation should be made on the basis of a theoretical measurement, without regard to the amount of the material actually excavated. The parties disagree as to how this theoretical measurement was to be made. The pertinent language is in paragraph 56 of Specifications 570, and is as follows:
And provided further, That immediately prior to the beginning of the work under the contract, the contracting officer will make a survey of the river bed and banks to be included in the cofferdams, and for common excavation within the cofferdams, measurement for payment will be made to the original surface contours thus established and to side slopes of 2 to 1 at right angles to the axis of the dam, beginning ten (10) feet beyond the outside dimensions of the concrete in the foundations at the original surface of the bed rock * * *.
The final words “at the original surface of the bed rock” were inserted in the specifications by an addendum shortly before the bids were opened.
The controversy in this cause of action is as to the point at which to begin measuring the ten-foot line. At the end of the ten-foot line the 2 to 1 slope upward began. Hence the depth of the point of beginning of the ten-foot line determined the depth, not to' which actual excavation would be *174 made, but to which measurement would be made for pay purposes.
Because of the uneven surface of the rock and the variation in the necessary rock excavation, the outside surface of the flat plane of the dam extended down farther in places where the rock was lower, making the fillet or skirt of the dam somewhat uneven. The beginning point of the ten-foot line was, then, at different depths at different points along the face of the dam.
The plaintiffs claim that the ten-foot line should begin at the point of contact of the concrete of the dam as actually constructed with the rock upon which the dam was placed after excavation. This contention places the ten-foot line deep, and, by starting the 2 to 1 slope from this deep point, includes a large area for pay measurement. The Government actually paid the plaintiffs on the basis of starting the ten-foot horizontal line from the point where the concrete of the dam would have come in contact with the original rock surface if the fillet of the dam had been placed on the original rock surface, instead of being, as it was, carried to excavated rock surface. We think there is not much to be said for this method of measurement. But it resulted in the plaintiffs’ being paid for a good deal more common excavation than they would have been paid for if the method of measurement which we think the specifications required had been used. That method would have been to start the ten-foot line at the point where the actually constructed dam intersected the line of the original rock surface. We do not think that the pointed reference to the “original surface” can be interpreted to mean “the final surface after excavation.”
The plaintiffs cannot recover upon this cause of action.
SixteeNth Cause of Action
THE REQUIREMENT OE THE CONTRACTING OEEICER THAT THE CONTRACTOR CONSTRUCT THE OUTLET CONDUITS WITH A DESIGN DIFEERENT FROM THAT SHOWN ON THE CONTRACT DRAAVINGS
Our Findings 211 to 218 relate to this cause of action. The design for the dam called for 10 pairs of outlet conduits about eight feet in diameter to extend through the *175 whole width of the dam from its upper to its lower face. As these conduits were designed when contracted for, each one contained a vertical downward curve. Later the design was changed so that each conduit, in addition to the vertical curve, had also a horizontal curve. Thus the two conduits in each pair were about 6 feet apart at the upstream face of the dam, ran parallel for about 110 feet, and then curved slightly away from each other, being about 15 feet apart at their downstream ends. The additional curves added to the cost of constructing the forms for the conduits in the plaintiff’s carpenter shop, and of placing the forms. On the other hand, the fact that the forms were farther apart for a portion of their length made it easier to place concrete under and around them.
The plaintiffs sue for the additional expense caused by the change of design. The Government relies on paragraph 24 of Specifications 570 which is quoted in our Finding 214. The sentence claimed to be pertinent says:
The Government reserves the right to make such reasonable changes as, in the opinion of the contracting officer, may be considered necessary or desirable, and the contractor shall be entitled to no extrá compensation because of such changes, except that- any increase in the amount of excavation, concrete, or other required work, for which items are provided in the schedule, will be paid for at the unit prices bid therefor in the schedule.
The Government says that since the contract called for no unit prices for building and placing forms, payment for that work being included in the unit price of placing concrete, the plaintiffs are not entitled to be paid for the costs resulting from the change of design.
We think the Government’s argument is not valid. We think that the language quoted merely meant to bring extra work within the unit prices set in the contract, if the extra work was the kind of work to which the unit prices applied. This would eliminate any argument as to whether the unit price fixed in the contract was an adequate or reasonable price. But we think that the quoted provision would not give the Government the privilege, without limit, of changing the design in such a way as to cause the contractor substantial extra cost, and not paying him that extra cost because *176 the change did not result in any greater number of pay units than the original design.
The plaintiffs may recover $2,334.06 on this cause of action.
SEVENTEENTH CAUSE OP ACTION
THE CLAIM ARISING OUT OF CHANGE IN PLANS FOR THE EXCAVATION FOR THE PUMP HOUSE
Findings 219 to 229 relate to this cause of action. The original contract did not provide for excavation for a pump house. Order for Changes No. 1 did provide for it, and the pertinent drawing showed that the excavation was to result in horizontal benches and % to 1 slopes in the rock. Before the excavation was done, new drawings were given to the plaintiffs changing some of the % to 1 slopes to vertical faces, and some of the horizontal benches to slopes of 4 to 1 and 2 to 1.
The plaintiffs claim, and we have found, that the trimming of a vertical rock face is more expensive than the trimming of a sloped face. However, the % to 1 slope provided for in the adjustment of compensation was varied so slightly from the vertical, that the difference in expense was not large. Workmen in either case had to be suspended from above to trim the face. On the slightly sloped face, they could brace their feet better, and work somewhat more efficiently. We have found that the difference in efficiency made a difference in cost of $1,148.30.
The change from horizontal benches to slopes of 4 to 1 and 2 to 1, created some additional work for the plaintiffs because the slopes were so gradual that the rocks would not roll down to where the power shovel could load them, and yet were so steep that the power shovel could not move up on the slopes. A bulldozer was used to push the rocks down to where they could be loaded. But the bulldozer was kept available for other purposes as well as for this purpose, and we are not able, from the evidence, to determine how much the additional expense may have been.
The plaintiffs claim that because of the change from % to 1 slopes to vertical faces the overbreak, or unintended removal of rock beyond the lines marked for excavation, was *177 increased. The contract provided that overbreak would not be paid for. Because of the change in the drawings after Order for Changes No. 1 was accepted, the plaintiffs would, perhaps, be entitled to payment for disposing of the additional overbreak caused by the changes. But they have not proved, even approximately, what that additional overbreak was.
The plaintiffs are entitled to recover $1,148.30 on this cause of action.
EIGHTEENTH CAUSE OE ACTION
THE CLAIM WITH REGARD TO DELAY IN DELIVERY BY THE GOVERNMENT OE METAL GATES
Our Findings 230 to 244 relate to this cause of action. The contract provided that the Government was to furnish and the plaintiffs were to install paradox and ring-follower gates in each of the conduits which we have described in the Sixteenth Cause of Action. The plaintiffs were to be paid one cent per pound for the work of installation. As we shall see, the installation of the gates by the plaintiffs was finally eliminated. They concede that the installation at the agreed price would not have been profitable and they make no claim on that account. They claim that it was a breach of contract by the Government not to deliver them when the concrete work had progressed to the stage when they should have been installed, and that they suffered consequential damages from this alleged breach of contract.
The plaintiffs planned to install the gates when the concrete placing had reached the heights of the bottom of the conduits and gates. On April 1,1936, they issued their first construction schedule, which showed that they contemplated installing the gates in August, September and October 1937. On September 25, 1936, the Government requested bids for the manufacture of the gates. On October 17, the plaintiffs submitted a revised construction schedule, indicating that they would be ready to install 4 sets of the gates in May 1937, and the other 16 sets in July and August 1937. On October 28,1937, the construction engineer wrote the plaintiffs that he did not think it would be practicable to secure delivery of any of the gates by May 1,1937, or earlier than *178 July 1937. He said that studies were being made as to the •possibility of “boxing out a well”, i. e. leaving an opening in the concrete for the later installation of the gates. On November 9,1936, the plaintiffs replied, requesting that a special effort be made to get the gates- in time for installation under the new schedule, and saying that if that could not be done, “plans should be developed for boxing out a well so .that work will not be delayed.”
On December 4, 1936, the Goverment entered into a contract for the manufacture of the gates, which contract required the shipment of the gates from the factory in July, August and September 1937. On January 11, 1937, the plaintiffs wrote that they were six weeks ahead of their October 17, 1936, schedule, and that unless the manufacturer of the gates could deliver them in time for that schedule, “it is suggested that the(se) plans for boxing out be completed * * It was not possible to secure the delivery of the gates in time for installation under the accelerated schedule, and the boxing-out device was followed.
We think that the non-delivery of the gates in time for installation before the concrete was poured at their elevation was not a breach of contract by the Government. There is no showing that it would have been practicable for the Government to change its arrangements for the manufacture of these heavy and specially designed gates to accord with the plaintiffs’ change in their construction schedule. It is evident from the correspondence that the plaintiffs would not have been willing to delay their work and go back to the former construction schedule in order to install the gates concurrently with the pouring of the concrete at their level. Boxing out, with whatever, adverse effects it might have upon the plaintiffs, became from that time the necessary procedure. And since the plaintiffs would have made no profit from being paid the agreed price for the installation of the gates, it became, from that time, immaterial to them when the gates were delivered.
The boxing out, then, was not caused by a breach of contract'of the Government, but by a change of design made by the Government to accommodate the plaintiffs and the Government by letting the plaintiffs’ work go forward. Par *179 agraph 24 of Specifications 570, quoted in Finding 168, expressly reserved to the Government the right to make such a change of design without additional compensation to the plaintiffs unless the change required the performance of additional units of pay items. We have discussed this provision in connection with the Eleventh Cause of Action.
The effect of the change providing for the boxing out of the wells for the later installation of the gates was to deprive the plaintiffs of the placing of concrete in the spaces occupied by the wells on which, if they had placed it, they would have made a profit of $12,000, and to cause them to do unpaid work costing $9,334.68 in constructing forms and in placing concrete around the block-out forms. But, as we have shown in our discussion of the Eleventh Cause of Action, the effect of all the changes made in the designs and plans in the course of the work, including the boxing-out change, was favorable to the plaintiffs and gave them more paid work and less unpaid work than they would have had if no changes had been made. There is, therefore, no equitable reason why the Government should not have the advantage of the privilege reserved in the specifications.
Another result of the non-installation of the gates concurrently with the pouring of the concrete was that the conduits could not be used for the diversion of water, but had to be blocked up with bulkheads. To divert the water, two blocks of the dam were left ten feet lower than they would otherwise have been, and the plaintiffs did not pour the concrete in those blocks, on which concrete they would have made a profit of $17,975.54 if they had poured it. This change in design was, like the boxing out, a change made to accommodate the parties and get the work forward. It was within the privilege reserved to the Government in the specifications. As to the equity of depriving the plaintiffs of this profit, the concrete in these blocks is also within our computation which shows that, on balance, the plaintiffs had considerably more paid work and less unpaid work than they would have had if no changes had been made.
The plaintiffs are not entitled to recover upon this cause of action.
*180 NINETEENTH CAUSE OF ACTION
CLAIM; FOR PAINTING) TRASHRACKS NOT INSTALLED BT CONTRACTOR, AND FOR BUILDING A SHELTER TO FACILITATE PAINTING
Our Findings Nos. 245-251 relate to this cause of action. The Government was to furnish metal trashracks which the plaintiffs were to paint, with paint furnished by the Government, and install in the dam. The shop coat of paint which had been applied at the factory was defective, and the paint to be applied by the plaintiffs would not stick to it. The shop coat was removed by the plaintiffs who were paid for that work under an extra work order. Delay had occurred, however, and the weather had become so cold by December 3, 1937, that the trashracks not painted by that time could not, economically, be painted although there were some days when painting could have been done. The upstream cofferdam was flooded December 10, and that made impossible the installation of trashracks after that date until the next spring.
The plaintiffs asked to be relieved of the painting and installation of the rest of the trashracks, in view of the fact that their contract was practically completed. This request was granted. The plaintiffs seek payment for the painting of 63 trashracks which they painted but did not install. Under the contract, they were to be paid a unit price per pound for painting and installing the trashracks.
We think the plaintiffs should be paid for the painting. The delay in painting, and hence in installation, was not due to their fault. When they requested and were granted permission not to complete the installation, nothing was agreed upon as to whether they would, or would not, be paid for the painting of the racks not installed. The Government had the benefit of the painting, and the plaintiffs may recover its cost, $915.65. As to the temporary shelter, the cost of which the plaintiffs also claim, that was a building constructed by them for the purpose of facilitating their painting during uncertain weather, and there is no reason why the Government should pay for it.
The plaintiffs may recover $915.65 on this cause of action.
*181 TweNtteth Cause oe Action
THE RESTRICTIONS PLACED UPON THE ORDER OE DRILLING HOLES EOR “b” HOLE GROUTING
This cause of action, is covered by our Findings 252-257. The purpose of the “B” hole grouting was to fill with cement paste any seams or fissures which might exist in the rock foundation of the dam, so that the foundation would be impervious to the water impounded by the dam. Holes 20 or 30 feet deep were to be drilled in five lines parallel to the-upper face of the dam, the lines being 20 feet apart and the holes in each line 20 feet apart. After an initial experience which showed that grout pressed into one hole had a tendency to come out of another hole some distance away, the Government’s Chief Inspector imposed a restriction whereby no hole could be drilled within 80 feet of another hole which had not yet been grouted, unless an intervening curtain of grouting had already been placed. The restriction was necessary to successful grouting, and was reasonable. It was not in violation or excess of the provisions of the contract. Although it made the plaintiffs’ operations somewhat more expensive, by requiring the drilling and grouting crews to move their equipment back and forth more than they would have if the adjoining holes had been drilled in succession, and by causing the crews to be idle or to be set at work ordinarily done by employees whose wages were less, it was not a breach of contract.
The plaintiffs cannot recover upon this cause of action.
Twenty-First Cause oe Action
THE REQUIREMENT OE THE CONTRACTING OEEICER THAT THE CONTRACTOR CAULK SEAMS IN THE LEDGE ROCK TO PREVENT GROUT EROM ESCAPING
Our Findings 258-260 relate to this cause of action. In the “B” hole grouting described in our discussion of the Twentieth Cause of Action, when the grouting liquid was-put into the holes under pressure, some of it would escape-through seams and come out on the surface of the rock or on the side, if there was an exposed vertical surface. Grout *182 would thus be wasted, and the escape of the grout to the surface would reduce the pressure so that the interior seams would not be successfully filled. The contracting officer required the plaintiffs to caulk the surface seams with oakum, lead wool and wooden wedges. The contract made no express provision for such caulking, and plaintiffs claim pay for it as extra work. The grouting called for by the contract could not have been successfully done without the caulking, hence there is plausibility in the Government’s argument that the caulking was impliedly required by the contract. There is evidence that the Government’s agents knew from their experience at Boulder Dam that caulking would be necessary and that the plaintiffs did not know that it would be necessary. In the circumstances, we think that this work was not required by the contract and should be paid for. The plaintiffs’ costs are shown in our Finding 260.
The plaintiffs may recover $8,357.26 on this cause of action.
TweNtt-thiRD Cause oe Action
ALLEGED RESTRICTIONS OE THE CONTRACTING OEEICER IN CONNECTION WITH THE USE OE DYNAMITE EOR ROCK EXCAVATION
Our Findings 261-271 relate to this cause of action. We have found that the Government restricted the plaintiffs to the use of 25-percent dynamite in the rock excavation of the foundation of the dam, and' to the use of half a stick of dynamite per lineal foot of drilled hole. The 25-percent dynamite was too weak to loosen and break up the rock effectively and economically. As a consequence, the plaintiffs had to drill more holes than they would have had to drill if they had used 40-percent dynamite, the power shovels could not load the rock efficiently and were subjected to greater wear and tear. The plaintiffs claim also that more handwork clean-up in the way of barring and wedging was required than would have been required if stronger dynamite had been used. This last claim has not been proved. The evidence seems to indicate that the cost of hand clean-up may have been somewhat less as a result of the use of the weaker dynamite.
*183 The amount of the plaintiffs’ damages resulting from the-improper restrictions on their dynamiting operations has not been proved with definiteness. There were damages. The plaintiffs’ witnesses estimated their amount. The Government’s accountants could not, from the plaintiffs’ records, supply any helpful evidence. We think the estimates of the plaintiffs’ witnesses are much too high, and, in this un- • satisfactory state of the evidence, we conclude that $100,000 is a fair award for the additional cost of drilling, and $50,000 a fair award for the additional cost of loading and the wear and tear on equipment.
The plaintiffs may recover $150,000 on this cause of action.
TwbNTy-NINth Cause op ActioN
THE TAKING BY THE CONTRACTING OEEICER OE PART OE THE PLANT AND EQUIPMENT OE THE CONTRACTOR UNDER ASSERTED AUTHORITY OE THE CONTRACT
This cause of action is covered by our Findings 272 to 290, and the details will not be repeated here. The belt conveyor system controversy presents a problem of some interest. Under paragraph 28 of the specifications, the plaintiffs gave to the Government an option to purchase for $100,000 a considerable number of items of plant and equipment including
* * * all railroad track and other railroad transportation facilities installed by the contractor, except trucks or rolling stock and including any tramways, used by the contractor for transporting concrete aggregates from the gravel deposits to the aggregate production plant and/or to the contractor’s mixing plant; * * *
The plaintiffs say that they did not install a railroad or tramway, but a belt conveyor system, and that it was not covered by the option.
The option was agreed to, of course, before any of the things covered by it were installed on the ground or, perhaps, were in existence. The things mentioned in it were the kinds of things which, the parties must have intended, would be installed. It would be remarkable if one, having agreed to sell a list of items which the parties supposed were to be obtained and used by him, could completely alter the agree *184 ment by substituting for one of the items in the list something-not named there but serving the same purpose as the item, for which it was substituted. Such a result would be so. patently unjust that a court should go far to hold that the-item in question was covered by the agreement. We think; that the language quoted was intended to cover whatever-means the contractor might install, and that the somewhat; unclear word “tramways” meant any carrying device installed and used. The fixed installations of the conveyor-belt system were, therefore, covered by the option. The belts-were not, and the plaintiffs are entitled to recover their value-, as of March 1938, which was $36,839.31.
The sum of all the items of recovery shown above is-$658,125.99, and the plaintiffs may have judgment for this; amount.
It is so ordered.
Howell, Judge; Whitaker, Judge; Littleton, Judge;- and Jones, Chief Judge, concur.